[No. H035576. Sixth Dist. Sept. 9, 2011.]

DOLLINGER DEANZA ASSOCIATES, Plaintiff and Appellant, v.
CHICAGO TITLE INSURANCE COMPANY, Defendant and Respondent.

1134

Counsel

Allen Matkins Leck Gamble Mallory & Natsis, Robert R. Moore, Michael J. Betz and Nicholas A. Subias for Plaintiff and Appellant.

Holme Roberts & Owen, Dena M. Cruz, Richard J. Mooney, Linnea Brown; Scott Noble and Peter K. Wolff for Defendant and Respondent

Garrett & Tully, Ryan C. Squire, Michael K. Dewberry and Zi C. Lin for California Land Title Association as Amicus Curiae on behalf of Defendant and Respondent.

Opinion

**BAMATTRE-MANOUKIAN, Acting P. J.—**

## I. INTRODUCTION

This appeal arises from a dispute concerning title insurance coverage. In 2004, appellant Dollinger DeAnza Associates (Dollinger) purchased real property in Cupertino that it believed was divided into seven parcels, with the intention of selling parcel 7. In conjunction with the purchase, Dollinger obtained a title insurance policy from respondent Chicago Title Insurance Company (Chicago Title). Dollinger later entered into an agreement to sell parcel 7, but the sale was not completed because the purchaser, Pacific Peninsula Group, withdrew after learning that the City of Cupertino had recorded a notice of merger in 1984 that stated all seven parcels were merged into a single parcel. The notice of merger was not included in Chicago Title's title report.

Dollinger tendered a claim under the Chicago Title policy due to the failed sales transaction for parcel 7. Chicago Title initially denied Dollinger's claim under the wrong policy, then accepted the claim under the policy that Dollinger had actually purchased. Chicago Title subsequently determined that Dollinger's claim was not covered. Dollinger then filed a complaint against Chicago Title that included causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.

Chicago Title moved for summary judgment, or, in the alternative, summary adjudication, arguing that Dollinger could not establish a breach of

contract and as a result the causes of action for breach of the implied covenant of good faith and fair dealing and for declaratory relief also failed. The trial court granted the motion for summary judgment, determining as a matter of law that Chicago Title's policy did not provide coverage for Dollinger's claim and Chicago Title was not equitably estopped from denying coverage due to its postclaim conduct. Judgment was entered in Chicago Title's favor, and Dollinger appeals.[1] For the reasons stated below, we agree with the trial court and therefore we will affirm the judgment.

## II. FACTUAL BACKGROUND

### A. *The Real Property Purchase*

A parcel map recorded in 1979 indicates that the property located at 1601 South De Anza Boulevard was comprised of seven separate legal parcels. In 1984, the South Bay/Cupertino limited partnership (South Bay/Cupertino), the owner of the property, sought permission from the City of Cupertino (City) to build an office building. The City issued a conditional use permit that included a requirement that the owner merge all seven parcels within the project boundary. The City filed a notice of merger with the Santa Clara County Recorder on October 9, 1984, where it was indexed in the grantor-grantee index under the name City of Sunnyvale.[2]

The notice of merger states, "This notice is filed under the provisions of Section 66424.2. The real property in the City of Cupertino, County of Santa Clara, described in the attached Exhibit A and owned by South Bay/Cupertino . . . is, under the provisions of the Subdivision Map Act and Ordinance of the City of Cupertino, merged for the purpose of the Subdivision Map Act into a single parcel." Exhibit A to the notice of merger describes the property as consisting of seven parcels.

In September 2004, Dollinger purchased the property, including the office building and other improvements. It was essential to Dollinger that the property was divided into seven parcels, because Dollinger intended to sell

---

[1] We granted the application of the California Land Title Association to file an amicus curiae brief in support of respondent Chicago Title and have considered Dollinger's opposition to the filing of the brief and its argument on the merits.

[2] Chicago Title asserts that the notice of merger was not legally recorded in the absence of compliance with all of the procedural requirements for recording. As we will explain, whether the notice of merger was legally recorded is not relevant to our analysis of the parties' title insurance coverage dispute.

parcel 7, which was being used as an overflow parking lot. By 2007, Dollinger had entered into an agreement to sell parcel 7 to Pacific Peninsula Group for $3 million.

In March 2008, Pacific Peninsula Group withdrew from its commitment to purchase parcel 7 and cancelled escrow after learning from the City that a notice of merger, which merged all seven parcels into one parcel, had been recorded in 1984.

### B. *The Title Insurance Claim*

#### 1. *The Chicago Title Policy*

Dollinger purchased an American Land Title Association (ALTA) title insurance policy from Chicago Title dated September 24, 2004. The insuring agreement for the policy states in part, "Subject to the exclusions from coverage, the exceptions from coverage contained in Schedule B and the conditions and stipulations, Chicago Title . . . insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of: [¶] 1. Title to the estate or interest described in Schedule A being vested other than as stated therein; [2.] Any defect in title or encumbrance on the title; [¶] 3. Unmarketability of title; [¶] 4. Lack of a right of access to and from the land."

The schedule A attachment to the policy describes the land referred to in the policy as comprised of seven parcels. The schedule B attachment to the policy lists the "exceptions from coverage," such as easements, liens, and leases, for which the policy did not "insure against loss or damage" arising therefrom. Schedule B did not include the notice of merger as one of the exceptions.

#### 2. *Dollinger's Claim*

In April 2008, Dollinger's attorney tendered a claim to Chicago Title, "based on the fact that the Property does not contain separate legal parcels and in connection with the fact that our client will be unable to profit from the portion of its Property which it thought was a separate legal parcel. Our client had agreed to sell this portion of the Property to a housing developer for three million dollars."

In a letter dated May 19, 2008, Chicago Title denied Dollinger's claim on the ground that the claim fell within the policy exclusion that excluded from coverage any losses or damage arising from "governmental regulation restricting the separation in ownership or a change in the dimensions or area of the insured property or any part thereof, *whether or not* this restriction was shown in the public records on the date the policy was issued. We have concluded that the Notice of Merger and the affect [*sic*] thereof are excluded from the coverage of the policy issued to [Dollinger]."

Dollinger responded by filing, on August 5, 2008, an action against Chicago Title for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. Thereafter, in an e-mail dated September 7, 2008, Chicago Title reversed its coverage decision, stating, "Your client [(Dollinger)] tendered a claim to Chicago [Title] arising [from] a recorded Notice of Merger, which claim was denied based upon exclusionary language in the CLTA [(California Land Title Association)] owners policy. The company had issued a CLTA policy to your client in September 2004. However, upon further review of this matter we have determined that [Chicago Title] should have issued an ALTA policy to your client. Under the coverage afforded by an ALTA policy the Notice of Merger is a covered matter.[3] Accordingly [Chicago Title] accepts the claim and will retain counsel to undertake curative action on behalf of your client with respect to the Notice of Merger. [¶] You agreed to give [Chicago Title] an extension within which to answer the complaint filed in the above action. . . ."

Thereafter, Dollinger's attorney received a letter dated October 15, 2008, from Scott A. Sommer, an attorney retained by Chicago Title, which stated, "This office has been retained by [Chicago Title] to evaluate the effect, if any, of the Notice of Merger recorded October 9, 1984, . . . upon the real property described as Parcel 7 in the above-referenced policy, acquired by [Dollinger] on September 24, 2004. [¶] . . . [¶] Our office is not defending [Chicago Title] in the action that you filed in Santa Clara County for damages and declaratory relief. Instead, our role is to evaluate and potentially help remedy the situation with the Notice of Merger before the City of Cupertino."

A few months later, Chicago Title again reversed its coverage decision, as stated in a letter dated February 9, 2009, to Dollinger's attorney. In that letter,

---

[3] "Two types of title insurance policies are available to owners of real property interests in California, CLTA and American Land Title Association (ALTA). CLTA insures primarily against defects in title which are discoverable through an examination of the public record, and ALTA additionally insures against off-record defects, including rights of parties in possession and not shown on the public records, water rights, and discrepancies or conflicts in boundary lines and shortages in areas that are not reflected in the public record. [Citation.]" (*Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 318, fn. 1 [129 Cal.Rptr.2d 372] (*Elysian*).)

Chicago Title's claims counsel wrote that Chicago Title had "reviewed the claim anew" under the ALTA policy and was taking the "opportunity to provide you with our analysis and preliminary opinion regarding coverage." Claims counsel then gave Chicago Title's preliminary opinion that Dollinger's claim was not covered, because "the Notice of Merger had no legal effect on the land described in the ALTA policy. Notwithstanding that fact, even if we assume (solely for purposes of this analysis) that Parcel 7 was not a separate legal parcel at the time the policy was issued, the claimed defect would impact only the value and use of the property, not the validity of Dollinger's title (ownership interest) to it. As such, any losses caused by that defect would not fall within the affirmative coverage provisions of the policy." Alternatively, claims counsel stated that Dollinger's claim was excluded under the government regulation exclusion.

In December 2009, Chicago Title's person most knowledgeable, Michael E. Busch, testified in his deposition that he believed that Chicago Title had not made a final determination as to Dollinger's claim.

## III. PROCEDURAL BACKGROUND

### A. *The Pleadings*

The first cause of action for breach of contract in Dollinger's August 5, 2008 complaint alleges that "Chicago Title breached the Title Insurance Policy by, among other things, refusing to honor or accept Dollinger's claim where: (a) the Title Insurance Policy represented that the Property consisted of seven separate legal parcels, when it did not; (b) the Title Insurance Policy failed to disclose the existence of the Notice of Merger, recorded in October 1984; and (c) the title to Parcel Seven is not marketable."

In the second cause of action, Dollinger alleges that Chicago Title's refusal "to fulfill its obligations under the Title Insurance Policy" constitutes a violation of the implied covenant of good faith and fair dealing, which frustrated Dollinger's "enjoyment of its rights under the Title Insurance Policy."

The third cause of action for declaratory relief seeks a determination of the parties' respective rights, liabilities, and obligations under the Chicago Title policy.

### B. *The Motion for Summary Judgment*

Chicago Title filed a motion for summary judgment, or, in the alternative, summary adjudication, that was set for hearing in December 2009. Its chief

argument was that Dollinger could not establish the cause of action for breach of contract because the Chicago Title policy did not cover Dollinger's claim, and therefore the related causes of action for breach of the implied covenant of good faith and fair dealing and for declaratory relief necessarily failed.

Specifically, Chicago Title argued Dollinger could not establish breach of contract because "[t]o the extent that plaintiff's complaint can be construed as alleging that the policy issued by Chicago Title insured plaintiff against loss that plaintiff might sustain if Parcel Seven were not a separate and distinct legal parcel, the evidence presented in support of the motion shows that this claim is without merit because the Notice of Merger was void and did not effect a merger of Parcel Seven and the other parcels." Relying on public records for which it requested judicial notice, Chicago Title asserted that the 1984 notice of merger was void because there had been no compliance with various procedural requirements for recording a notice of merger, as set forth in the Government Code, including, among other things, a failure to properly index either a notice of intention to determine status or a notice of merger under the name of the property owner in 1984, South Bay/Cupertino (Gov. Code, § 66451.19, subd. (a)).[4]

Alternatively, Chicago Title contended that the notice of merger did not affect Dollinger's title to parcel 7 or make the title unmarketable. Chicago Title explained that restrictions imposed under the Subdivision Map Act (§ 66410 et seq.) on a property owner's right to sell or develop a property do not affect an owner's title because such restrictions do not give anyone else an interest in the property.

Also, to the extent Dollinger was attempting to allege a claim for deceit or negligence, Chicago Title argued that the claim would lack merit because a cause of action for misrepresentation or negligence cannot be based on a title insurance policy's failure to disclose a recorded document affecting title.

### C. Dollinger's Opposition

Dollinger opposed the motion for summary judgment on the ground that its breach of contract cause of action was meritorious because its title insurance claim fell within Chicago Title's policy coverage for losses or damage incurred due to the unmarketability of the title to the insured property. Dollinger relied upon the definition of "unmarketability of the title" in the Chicago Title policy, as follows: "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released

---

[4] All statutory references hereafter are to the Government Code unless otherwise indicated.

from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."

According to Dollinger, "[t]he risk insured by Chicago Title is exactly what occurred. The parties to the sale discovered a notice of merger and the buyer was released from its obligation because Dollinger could not deliver marketable title." Dollinger further asserted that it was sufficient for the notice of merger to merely appear to affect the title for the title to be unmarketable. Therefore, in Dollinger's view, even if the notice of merger did not actually affect the title to parcel 7, its claim fell within the coverage for losses or damage incurred due to the unmarketability of the title. For that reason, Dollinger maintained that Chicago Title's argument that the notice of merger was void was irrelevant.

Dollinger also argued that Chicago Title should be estopped from denying coverage because it had initially accepted Dollinger's claim without any reservation of rights. Dollinger also complained that the attorney retained by Chicago Title, Scott Sommer, had actually aided Chicago Title's defense while purporting to represent Dollinger. Finally, Dollinger contended that Chicago Title's "flip flopping" positions on whether Dollinger's claim was covered showed the existence of a triable issue of material fact barring summary judgment.

### D. *The Trial Court's Order*

The trial court issued its order on March 3, 2010, granting Chicago Title's motion for summary judgment. After granting Chicago Title's request for judicial notice of certain public records maintained by the Santa Clara County Recorder, the trial court ruled that Chicago Title had met its burden to establish that the cause of action for breach of contract lacked merit as a matter of law.

The trial court determined that Chicago Title's evidence demonstrated that the notice of merger recorded on October 9, 1984, was void because it was not indexed under the name of South Bay/Cupertino, and therefore the notice of merger did not effect a merger of parcel 7 with the other six parcels. The trial court further determined that the notice of merger did not affect the marketability of Dollinger's title to parcel 7, because, as stated in *Hocking v. Title Ins. & Trust Co.* (1951) 37 Cal.2d 644 [234. P.2d 625] (*Hocking*), "restrictions imposed on an owner's right to develop or sell property do not cast doubt on the owner's title."

Since Chicago Title had carried its burden to show that the cause of action for breach of contract lacked merit as a matter of law, the trial court ruled that

Chicago Title had also met its burden as to the causes of action for breach of the implied covenant of good faith and fair dealing and for declaratory relief. The court reasoned that "a bad faith claim cannot be maintained unless policy benefits are due under the contract. [Citation.] [Chicago Title] also carries its burden as to the third cause of action for declaratory relief, since the actual controversy alleged . . . is simply the coverage dispute between the parties regarding Parcel Seven and the effect of the Notice of Merger."

The trial court rejected Dollinger's argument that its claim fell within the policy coverage for losses or damage incurred due to unmarketability of title. The court stated, "Here, the policy's definition of 'unmarketability of title' is quite clearly based on whether there is an alleged or apparent matter *affecting* title, but as discussed above, impaired market value due to code violations or local ordinances that restrict the right to develop or sell the property does not affect the marketable quality of the title." The court also noted the rule that the opinions of claims adjusters or other employees of an insurer are inadmissible to interpret an insurance contract.

The trial court rejected Dollinger's contention that Chicago Title should be estopped from denying coverage due to its postclaim conduct. Noting that Dollinger had failed to plead a claim for equitable estoppel, the court ruled that Dollinger had failed to make the requisite showing that it had detrimentally relied upon Chicago Title's representation of coverage. While Dollinger argued that its detrimental reliance consisted of giving Chicago Title a five-month extension to respond to the complaint, the court found that Dollinger had not argued that it suffered any prejudice due to the extension. Moreover, the court determined that "[d]etrimental reliance is not established by voluntary delay in serving a summons and complaint in an action that otherwise lacks merit. [Citation.]"

Judgment on the order granting the motion for summary judgment was entered in Chicago Title's favor on March 30, 2010. Dollinger filed a timely notice of appeal from the judgment on May 12, 2010.

## IV. DISCUSSION

On appeal, Dollinger contends that the trial court erred in granting Chicago Title's motion for summary judgment after rejecting Dollinger's contentions that (1) its breach of contract cause of action has merit (and consequently the causes of action for breach of the implied covenant of good faith and fair dealing and for declaratory relief also have merit) because its claim was covered under Chicago Title's policy coverage for unmarketability of title and (2) Chicago Title should be estopped from denying coverage due to its postclaim conduct. Before addressing Dollinger's contentions, we will outline the applicable standard of review.

## A. *The Standard of Review*

The standard of review for an order granting a motion for summary judgment is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The trial court's stated reasons for granting summary judgment are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale. [Citation.]" (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 498 [60 Cal.Rptr.3d 11].)

In performing our independent review, we apply the same three-step process as the trial court. "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 [49 Cal.Rptr.3d 153].)

"We then examine the moving party's motion, including the evidence offered in support of the motion." (*Baptist v. Robinson, supra*, 143 Cal.App.4th at p. 159.) A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar, supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (§ 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002–1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

In determining whether the parties have met their respective burdens, the court must " 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar, supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.) Thus, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce

admissible evidence raising a triable issue of fact. [Citation.]" (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981 [126 Cal.Rptr.2d 32].)

We will begin our evaluation of the order granting Chicago Title's motion for summary judgment with a brief overview of title insurance and the rules governing the interpretation of a title insurance policy.

### B. *Title Insurance*

The Insurance Code provides that "[t]itle insurance means insuring, guaranteeing or indemnifying owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of: [¶] (a) Liens or encumbrances on, or defects in the title to said property; [¶] (b) Invalidity or unenforceability of any liens or encumbrances thereon; or [¶] (c) Incorrectness of searches relating to the title to real or personal property." (Ins. Code, § 104; see *id.*, § 12340.1.)

■ Thus, as the California Supreme Court has stated, "Title insurance, as opposed to other types of insurance, does not insure against future events. It is not forward looking. It insures against losses resulting from differences between the actual title and the record title as of the date title is insured. The policy does not guarantee the state of the title. Instead, it agrees to indemnify the insured for losses incurred as a result of defects in or encumbrances on the title. [Citation.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 41 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

In other words, the title insurer " 'does *not* represent expressly or impliedly that the title is as set forth in the policy; it merely agrees that, and the insured only expects that, the insurer will pay for any losses resulting from, or [the insurer] will cause the removal of, a cloud on the insured's title within the policy provisions.' [Citation.]" (*Lawrence v. Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70, 75 [237 Cal.Rptr. 264].) " 'A title policy is *not* a summary of the public records and the insurer is *not* supplying information; to the contrary [the insurer] is giving a contract of indemnity. . . . Every insurer can and does contract to indemnify against specific risks. . . .' [Citation.]" (*Ibid.*)

■ A title insurance policy is interpreted under "the well-established rules on interpretation of insurance agreements." (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 881 [221 Cal.Rptr. 509, 710 P.2d 309].) "In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of contract interpretation. [Citations.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention"

of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1378 [118 Cal.Rptr.3d 95, 242 P.3d 1020].)

"An insurance policy provision is ambiguous when it is susceptible of two or more reasonable constructions. [Citation.] If ambiguity exists, however, the courts must construe the provisions in the way the insurer believed the insured understood them at the time the policy was purchased. (Civ. Code, § 1649.) In addition, if, after the court evaluates the policy's language and context, ambiguities still exist, the court must construe the ambiguous language against the insurer, who wrote the policy and is held ' "responsible" ' for the uncertainty. [Citation.]" (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania, supra*, 50 Cal.4th at p. 1378.)

Keeping these rules in mind, we turn to Dollinger's contentions on appeal.

### C. *Breach of Contract*

#### 1. *Marketability of Title: The Parties' Contentions*

Dollinger contends that the trial court erred in finding that the cause of action for breach of contract lacked merit as a matter of law. According to Dollinger, its title insurance claim—for losses incurred when the Pacific Peninsula Group withdrew from its agreement to purchase parcel 7 after learning of the 1984 notice of merger—fell within the coverage provided by the Chicago Title policy for losses or damage incurred due to unmarketability of the title.

According to Dollinger, because the policy defines "unmarketability of title" to include "an alleged or apparent matter affecting the title to the land," it was not necessary for the notice of merger to actually affect title, since "it need only have a declared but legally unproven impact; a 'so-called' impact; or an apparent (but not necessarily) real or true [e]ffect or impact on title." Dollinger therefore contends that since the notice of merger appeared to affect the title to parcel 7 and entitled Pacific Peninsula Group to be released from the purchase agreement, the Chicago Title policy provided coverage for its claim. Dollinger also asserts that the policy's definition of "unmarketability of the title" is extremely broad, and therefore any ambiguity in the definition must be construed in Dollinger's favor.

Chicago Title disagrees, insisting that any effect the notice of merger had on Dollinger's ability to sell or develop parcel 7 was due to the restrictions placed on property owners under the Subdivision Map Act, sections 66451.10 through 66451.20. Relying on the decision in *Hocking, supra,* 37 Cal.2d 644, Chicago Title argues that "restrictions or burdens imposed on the sale or use [of] property by governmental land use regulations are not matters that affect the title to real property . . . ."

Chicago Title further asserts that Dollinger is able to convey good title to a buyer of parcel 7, and therefore the title is marketable, but Dollinger would violate the Subdivision Map Act "if it conveyed or developed the property before a subdivision map or a parcel map establishing Parcel Seven as a separate legal parcel was properly recorded." (Fn. omitted.) Chicago Title also argues that Dollinger's claim is excluded under the policy exclusion for losses or damage resulting from government regulations,[5] since Dollinger's claimed loss was the result of restrictions imposed under the Subdivision Map Act.

Alternatively, Chicago Title reiterates its argument below that the notice of merger did not render the title to parcel 7 unmarketable because the notice of merger was void, due to the lack of compliance with the Government Code procedural requirements for recording a notice of merger. According to Chicago Title, since the void notice of merger did not operate to effect a merger of parcel 7 with parcels 1 through 6, the notice of merger did not affect the marketability of title.

### 2. *Marketability of Title: Analysis*

We will begin our analysis by reviewing the pertinent language of the Chicago Title policy. The insuring agreement states in part, "Subject to the exclusions from coverage, the exceptions from coverage contained in Schedule B and the conditions and stipulations, [Chicago Title] insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the

---

[5] The Chicago Title policy exclusion regarding government regulation states in part, "The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expense which arise by reason of: [¶] 1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy."

Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of: [¶] . . . [¶] 3. Unmarketability of title." In the definitions section, the policy defines "unmarketability of the title" as follows: "an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."

Thus, the key issue in the present case is whether the notice of merger recorded in 1984, which states that parcels 1 through 7 are merged into one parcel, constitutes a "matter affecting the title to the land . . . which would entitle a purchaser . . . to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."[6]

We agree with the trial court that the notice of merger did not constitute a "matter affecting the title to the land." The California Supreme Court has stated that the word "title," in the context of land ownership, may be defined as follows: " 'The words "good title" import that the owner has the title, legal and equitable, to all the land, and the words "defective title" mean that the party claiming to own has not the whole title, but some other person has title to a part or portion of the land.' [Citations.]" (*Hocking, supra,* 37 Cal.2d at p. 649.)

Our Supreme Court has also defined "marketable title": " ' "A marketable title, to which the vendee in a contract for the sale of land is entitled, means a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his [or her] contract, would, in the exercise of that prudence which business men [or women] ordinarily bring to bear on such transactions, be willing and ought to accept." [Citations.]' " (*Hocking, supra,* 37 Cal.2d at pp. 649–650.) Thus, the test for a marketable title is "whether a reasonable purchaser, knowing that a third party might claim an interest in the property, would nevertheless proceed with the transaction." (*Mellinger v. Ticor Title Ins. Co. of California* (2001) 93 Cal.App.4th 691, 695–696 [113 Cal.Rptr.2d 357] (*Mellinger*).)

In *Hocking,* the plaintiff purchased two unimproved lots in a subdivision that did not meet the City of Palm Springs's requirements for the issuance of a building permit. The plaintiff made a claim under the title

---

[6] In California, "it is the general rule, in case of an executory contract that there is an implied agreement on the part of the vendor to convey a merchantable title, and failure to do so on demand and upon tender of final payment is a breach of the contract which justifies rescission and recovery of the money paid by the purchaser. [Citations.]" (*Craig v. White* (1921) 187 Cal. 489, 494 [202 P. 648].)

insurance policy for the lots, contending that the title to the lots was unmarketable. (*Hocking, supra*, 37 Cal.2d at pp. 646–647.) Our Supreme Court ruled that "[a]lthough it is unfortunate that plaintiff has been unable to use her lots for the building purposes she contemplated, it is our view that the facts which she pleads do not affect the marketability of her *title* to the land, but merely impair the market *value* of the property. She appears to possess fee simple title to the property for whatever it may be worth; if she has been damaged by false representations in respect to the condition and value of the land her remedy would seem to be against others than the insurers of the title she acquired. It follows that plaintiff has failed to state a cause of action under the title policy." (*Id.* at p. 652.)

As this court noted in *Lick Mill Creek Apartments v. Chicago Title Ins. Co.* (1991) 231 Cal.App.3d 1654 [283 Cal.Rptr. 231] (*Lick Mill*), the *Hocking* court emphasized the distinction between the marketability of land and the marketability of its title. (*Lick Mill*, at p. 1661.) " 'One can hold perfect title to land that is valueless; one can have marketable title to land while the land itself is unmarketable.' " (*Hocking, supra*, 37 Cal.2d at p. 651.) In *Lick Mill*, the plaintiffs incurred costs for the removal and cleanup of hazardous substances on land they had purchased. They sought indemnity under their title insurance policy on the ground that the presence of hazardous substances impaired the marketability of the property. (*Lick Mill, supra*, 231 Cal.App.3d at p. 1658.) When the title insurer denied coverage, the plaintiffs filed a complaint to which the defendant title insurer demurred. This court determined that since the plaintiffs had claimed coverage for the property's physical condition, they had pleaded "facts relating to marketability of the land rather than marketability of title." (*Id.* at p. 1662.) Therefore, this court rejected the plaintiffs' contention that "California courts have adopted a definition of marketable title that encompasses the property's market value." (*Id.* at p. 1660.) "Because marketability of title and the market value of the land itself are separate and distinct, plaintiffs cannot claim coverage for the property's physical condition under [the unmarketability of title] clause of the insurance policies." (*Id.* at p. 1662.)

Other courts have similarly limited coverage under the unmarketability of title provision in a title insurance policy to claims that arise from matters affecting title. In *Elysian, supra*, 105 Cal.App.4th 315, the plaintiff purchased a residence and later discovered that a notice that the premises were classified as substandard had been recorded. The title insurance policy for the property did not list the notice as an exception to coverage. (*Id.* at p. 318.) After the title insurer denied the plaintiff's claim, the plaintiff filed an action for breach of contract and breach of the implied covenant of good faith and fair dealing, but the trial court granted the defendant insurer's motion for summary judgment. (*Id.* at pp. 318–319.) The appellate court affirmed the judgment after determining that a notice of substandard dwelling does not affect title

and therefore the plaintiff's claim did not fall within the policy coverage for losses arising from unmarketability of title. (*Id.* at p. 325.) The court reasoned, "The fact that [the plaintiff] was required to bring the property up to code does not cast doubt on who owns the property." (*Id.* at p. 324.)

In *Nishiyama v. Safeco Title Ins. Co.* (1978) 85 Cal.App.3d Supp. 1 [149 Cal.Rptr. 355], the appellate division considered whether title to a property was unmarketable because the property had been subdivided in violation of the Subdivision Map Act. The plaintiffs asserted in their complaint that their title insurer was liable for the amount of the policy because the unlawfully subdivided property had no market value. (85 Cal.App.3d at p. Supp. 2.) The appellate division affirmed the order sustaining the title insurer's demurrer, determining that "it may be necessary for plaintiffs to comply with reasonable conditions with respect to their property as could have been required of the grantor as a condition of subdividing the latter's tract of land under the provisions of the Subdivision Map Act and any county ordinances [citation] but such conditions cannot be said to make the title unmarketable . . . ." (*Id.* at p. Supp. 7.)

In contrast, in *Mellinger, supra*, 93 Cal.App.4th 691, a triable question of fact was found as to whether the title to subdivided property was marketable. After purchasing the property, the plaintiffs determined that a busy street encroached on the property up to 20 feet. (*Id.* at p. 693.) The plaintiffs' title insurance claim, which the title insurer denied, was based upon the discrepancy in the property line. (*Ibid.*) The appellate court reversed the judgment in the title insurer's favor, determining that the "encroachment represented both a physical condition and a possible interest in the plaintiff's property. To the extent it was a road that crossed a portion of plaintiffs' property, it might have affected the market value of the property. But it also had the potential to affect plaintiffs' ownership or title to a portion of the property." (*Id.* at p. 696.)

The present case is distinguishable from *Mellinger* since, under the provisions of the Subdivision Map Act governing merger, the notice of merger that the City recorded on October 9, 1984, has no potential to affect Dollinger's title.

The Subdivision Map Act provides that "[a] local agency may, by ordinance which conforms to and implements the procedures prescribed by this article, provide for the merger of a parcel or unit with a contiguous parcel or unit held by the same owner if any one of the contiguous parcels or units held by the same owner does not conform to standards for minimum parcel size, under the zoning ordinance of the local agency applicable to the parcels or units of land . . . ." (§ 66451.11.)

"[T]he purpose of the [Subdivision Map] Act and the interests protected by the Act are furthered by the merger of substandard parcels to limit the impact of development in areas unable to handle increased demands on common resources and services. At one time, merger of substandard parcels was automatic [citations][.] That provision was limited as the statutes were modified successively over the years, the modifications presumably responding to concerns that lots were being merged without affording affected landowners notice and an opportunity to be heard, and also because of a state concern over local regulation of parcel merger for purposes of development. [Citations.]" (*Kalway v. City of Berkeley* (2007) 151 Cal.App.4th 827, 833–834 [60 Cal.Rptr.3d 477].)

■ The California Supreme Court has instructed that "[t]he literal terms of the Subdivision Map Act regulate the division of land into parcels only for purposes of sale, lease, or financing. The overall purpose of the act is to regulate *subdivisions*. [Citations.]" (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 748 [29 Cal.Rptr.2d 804, 872 P.2d 143] (*Morehart*).) The merger of parcels is governed by sections 66451.10 through 66451.21. (*Morehart, supra*, 7 Cal.4th at p. 749.)

"Section 66451.10(b) provides that sections 66451.10 through 66451.21 'shall provide the sole and exclusive authority for local agency initiated merger of contiguous parcels. On and after January 1, 1984, parcels may be merged by local agencies only in accordance with the authority and procedures prescribed by [those sections].' " (*Morehart, supra*, 7 Cal.4th at p. 749.) "Section 66451.11 prescribes the conditions under which '[a] local agency may, by ordinance which conforms to and implements the procedures prescribed by this article, provide for the merger of a parcel or unit with a contiguous parcel or unit held by the same owner.' The immediately subsequent sections specify the prescribed procedures and include detailed provisions for notice to the property owner, opportunity for hearing, and recordation by the local agency of a notice of the merger." (*Ibid.*) ·

This court discussed the Subdivision Map Act and the act's merger provisions in *van't Rood v. County of Santa Clara* (2003) 113 Cal.App.4th 549 [6 Cal.Rptr.3d 746] (*van't Rood*). " 'As now codified in the Government Code, the Subdivision Map Act constitutes the major land use permit control vehicle for urban planning and environmental protection. [Citations.]' [Citations.] When 'a landowner wishes to subdivide its property, the proposed subdivision must be consistent with applicable zoning ordinances and the landowner must comply with the Subdivision Map Act. [Citation.]' [Citations.]" (*Id.* at p. 564.) "To comply with the Act, the landowner must secure local approval and record an appropriate map. [Citation.] . . . Subdivided lands may not be legally sold, leased, or financed without the required approval and map. [Citations.]" (*Ibid.*)

Thus, as this court noted, "[t]he [Subdivision Map] Act's current merger provisions 'appear to reflect two overall concerns. First, they provide landowners with elaborate procedural safeguards of notice and opportunity to be heard before their lots can be involuntarily merged.' [Citation.] Second, they reveal '*a state concern over local regulation of parcel merger for purposes of development*' as well as for purposes of sale, lease, or financing. [Citation.]" (*van't Rood, supra,* 113 Cal.App.4th at p. 567.)

■ Accordingly, under the Subdivision Map Act, where, as here, a city has recorded a notice of merger for the purpose of involuntary merger of a landowner's contiguous parcels, the notice of merger serves the purpose of regulating local development and thereby impacts the landowner's ability to sell, lease, or finance the land. (*Morehart, supra,* 7 Cal.4th at p. 748.) The notice of merger may restrict a landowner's ability to sell a portion of the merged land without compliance with the applicable provisions of the Subdivision Map Act, but the notice of merger does not affect the landowner's title to the land.

Therefore, while the notice of merger at issue in this case may impact Dollinger's ability to *market* parcel 7, the notice of merger has no effect on Dollinger's *title* to parcel 7. Since the definition of "unmarketability of the title" in the Chicago Title policy expressly limits the coverage for losses or damages caused by unmarketability of the title to a "matter affecting the title to the land," Dollinger's claim arising from the notice of merger does not fall within the coverage. We need not address Chicago Title's contention that the notice of merger did not affect the title to parcel 7 because it is void due to noncompliance with the Subdivision Map Act, since whether it is valid or void, the notice of merger does not affect Dollinger's title.

■ We are not convinced by Dollinger's argument that because the policy definition of "unmarketability of the title" includes "an *alleged or apparent* matter affecting the title to the land," coverage is available since the evidence showed that the buyer of parcel 7, Pacific Peninsula Group, believed that the notice of merger affected the title to parcel 7 and withdrew from the purchase agreement. (Italics added.) The allegation that a notice of merger was recorded does not constitute an alleged or apparent matter affecting the title to land, since a notice of merger does not represent a third person's claim to an interest in the property (*Mellinger, supra,* 93 Cal.App.4th at p. 695) or otherwise cast doubt on who owns the property (*Elysian, supra,* 105 Cal.App.4th at p. 324).

For these reasons, we determine the Chicago Title policy does not provide coverage for Dollinger's claim under the unmarketability of the title coverage provision, and Dollinger's cause of action for breach of contract based on

Chicago Title's denial of coverage lacks merit as a matter of law. We therefore need not address Chicago Title's additional contention that Dollinger's claim is excluded under the policy exclusion for losses or damage resulting from government regulations.

### 3. *Estoppel/Waiver*

Alternatively, Dollinger argues that summary judgment is precluded because triable questions of fact exist as to whether Chicago Title should be estopped from denying coverage due to its postclaim conduct. Specifically, Dollinger asserts that Chicago Title accepted coverage without a reservation of rights, and that Dollinger relied upon that acceptance to its detriment when it agreed to give Chicago Title an extension of time to answer the complaint and also agreed to cooperate with Scott Sommer, the attorney retained by Chicago Title, whose analysis was the partial basis for Chicago Title's subsequent denial of coverage.

Chicago Title contends that for several reasons the trial court properly rejected Dollinger's estoppel argument. Since Dollinger did not plead in its complaint any facts that would support an estoppel or waiver claim, Chicago Title contends that Dollinger is procedurally barred from claiming waiver or estoppel. Chicago Title also points to the rule that waiver and estoppel cannot create insurance coverage where none exists, and argues the exception to the rule, for a liability insurer that defends the insured without a reservation of rights, does not apply. Further, Chicago Title argues that Dollinger failed to present any evidence to show detrimental reliance, in support of its estoppel claim, or to show Chicago Title's intentional relinquishment of a known right, in support of its waiver claim.

We understand Dollinger to argue that summary adjudication of the cause of action for breach of contract cannot be granted because triable questions of fact exist as to whether Chicago Title should be estopped from denying coverage due to its postclaim representation of coverage, as set forth in a Chicago Title representative's e-mail dated September 7, 2008, that states, "Your client [(Dollinger)] tendered a claim to Chicago [Title] arising [from] a recorded Notice of Merger, which claim was denied based upon exclusionary language in the CLTA owners policy. The company had issued a CLTA policy to your client in September 2004. However, upon further review of this matter we have determined that [Chicago Title] should have issued an ALTA policy to your client. Under the coverage afforded by an ALTA policy the Notice of Merger is a covered matter. Accordingly [Chicago Title] accepts the claim and will retain counsel to undertake curative action on behalf of your client with respect to the Notice of Merger. [¶] You agreed to give [Chicago Title] an extension within which to answer the complaint filed in the above action."

██ The rules governing the application of the doctrines of estoppel and waiver in the context of insurance coverage are well established. " ' "[I]t is the general and quite well settled rule of law that the principles of estoppel and implied waiver do not operate to extend the coverage of an insurance policy after the liability has been incurred or the loss sustained." ' [Citations.]" (*Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1066 [119 Cal.Rptr.3d 17]; see also *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 352 [44 Cal.Rptr.3d 426]; *Manneck v. Lawyers Title Ins. Corp.* (1994) 28 Cal.App.4th 1294, 1303 [33 Cal.Rptr.2d 771].) Thus, Dollinger's contention that coverage under the Chicago Title policy exists pursuant to the doctrines of estoppel and waiver lacks merit, unless there is an applicable exception to the general rule.

However, only liability insurers are subject to an exception. " 'The general rule supported by the great weight of authority is that if a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional defense of an action brought against its insured constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert such grounds.' [Citation.]" (*Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 755 [161 Cal.Rptr. 322].)

██ The exception does not apply here because Chicago Title is a not a liability insurer; instead, it is a title insurer that provides first party coverage. " 'First-party coverage refers to types of insurance under which the insurer contracts to pay benefits directly to the insured, as distinguished from liability or third-party coverage under which the insurer contracts to indemnify the insured against liability to third parties. First-party coverage includes life insurance, health and accident insurance, disability insurance, title insurance, property damage insurance, fire insurance, medical payments coverage and other types of policies providing for payments directly to the insured.' [Citation.]" (*McKinley v. XL Specialty Ins. Co.* (2005) 131 Cal.App.4th 1572, 1576 [33 Cal.Rptr.3d 98], italics omitted.)

Even assuming that Chicago Title could be estopped from denying coverage due to its postclaim conduct in accepting Dollinger's claim, then subsequently denying coverage, we agree with the trial court that estoppel is not available here because Dollinger failed to make an evidentiary showing of detrimental reliance.

" '[E]stoppel requires: (1) the party to be estopped knew the facts; (2) the other party was ignorant of the true facts; (3) the party intended his [or her] conduct would be acted upon, or acted in a manner that the party asserting the estoppel had a right to believe it so intended; and (4) the other party relied upon the conduct to his [or her] injury. Where one of the elements is missing, there can be no estoppel. [Citations.]' " (*Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1110 [58 Cal.Rptr.2d 133] (*Michaelian*).)

In *Michaelian*, the insured employer claimed that the defendant insurer's workers' compensation policy provided coverage for an employee's sexual harassment action. (*Michaelian, supra*, 50 Cal.App.4th at p. 1104.) The appellate court determined that the policy provided no coverage and rejected the employer's estoppel argument, stating, "While California law recognizes the doctrine of promissory estoppel, the party claiming it must plead all facts establishing the doctrine's elements. [Citation.] One of those elements is detrimental reliance. [Citation.] The only reliance alleged by Michaelian was his delay in serving the summons and complaint in a bad faith action which had no merit. He could not have suffered detriment from that delay." (*Id.* at p. 1112.)

The present case is similar. Dollinger argues that it relied to its detriment on Chicago Title's representation of coverage by granting Chicago Title an extension of time to answer the complaint and by cooperating with the attorney retained by Chicago Title. However, Dollinger has provided no evidence to show actual detriment or harm from the delay in litigating its action against Chicago Title or cooperating with Chicago Title's attorney. Had Dollinger refused to grant an extension of time to Chicago Title to answer the complaint and also refused to cooperate with Chicago Title's attorney, the result would have been the same: as a matter of law, the Chicago Title policy does not provide any title insurance coverage for Dollinger's claim arising from the notice of merger.

Consequently, we find no merit in Dollinger's contention that a triable issue of fact exists under the doctrines of waiver and estoppel that would preclude summary adjudication of the cause of action for breach of contract.

### D. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

Dollinger contends that because triable issues of material fact exist as to the cause of action for breach of contract, the cause of action for breach of the implied covenant of good faith and fair dealing must be "reinstated."

Chicago Title responds that the trial court properly held that there can be no breach of the implied covenant of good faith and fair dealing absent a breach of the insuring agreement.

 The California Supreme Court has ruled that a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained unless benefits are due under the plaintiff's insurance policy. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36 [44 Cal.Rptr.2d 370, 900 P.2d 619]; see also *Rios v. Scottsdale Ins. Co.* (2004) 119 Cal.App.4th 1020, 1027 [15 Cal.Rptr.3d 18].) Since we have determined as a matter of law that the Chicago Title policy provides no coverage for Dollinger's claim arising from the notice of merger, we also determine as a matter of law that Dollinger's cause of action for breach of the implied covenant of good faith and fair dealing lacks merit as a matter of law.

### E. *Declaratory Relief*

Dollinger also contends because triable issues of material fact exist as to the cause of action for breach of contract, the cause of action for declaratory relief must be "reinstated."

According to Chicago Title, the trial court properly granted summary adjudication of the cause of action for declaratory relief because the cause of action for breach of contract lacks merit as a matter of law.

 We determine that the trial court did not err in granting summary adjudication of the cause of action for declaratory relief. The court may properly grant summary adjudication of a claim for declaratory relief. (*Allis-Chalmers Corp. v. City of Oxnard* (1981) 126 Cal.App.3d 814, 818, fn. 3 [179 Cal.Rptr. 159].) "[D]eclaratory relief does not lie in a case in which a complaint makes no case on the merits and would merely produce a useless trial. [Citation.]" (*People v. Ray* (1960) 181 Cal.App.2d 64, 67 [5 Cal.Rptr. 113].) Here, as we have discussed, Dollinger's causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing arising from Chicago Title's denial of coverage lack merit as a matter of law. Summary adjudication of the remaining cause of action for declaratory relief, which seeks a declaration of the parties' rights, liabilities, and obligations under Chicago Title policy, is therefore appropriate.

Since all three causes of action in Dollinger's complaint lack merit as a matter of law, we conclude that the trial court did not err in granting Chicago Title's motion for summary judgment, and therefore we will affirm the judgment.

## V. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent Chicago Title Insurance Company.

Mihara, J., and Lucero, J.,[*] concurred.

---

[*]Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.