Filed 3/7/16  Allison v. Nat. Medical Ventures CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| RONALD ALLISON et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>NATIONAL MEDICAL VENTURES, Inc., et al.,<br><br>    Defendants and Respondents. | H040411<br>(Santa Clara County<br>Super. Ct. No. 109CV145956) |

Plaintiffs Ronald Allison, M.D. and 12 other physician limited partners in a California limited partnership called Litho I (Litho) appeal from a judgment entered after the trial court granted summary judgment in favor of defendants Litho, its former general partner National Medical Ventures, Inc. (NMV), and NMV's parent company Tenet HealthSystems Hospitals, Inc. (TH Hospitals) in a combination derivative and class action lawsuit arising out of the alleged mismanagement and dissolution of Litho. Plaintiffs contend that the trial court erred in granting summary judgment because (1) triable issues of fact remain with respect to the transfer of Litho's funds to an account controlled by Tenet Healthcare Corporation (Tenet) for 40 months;[1] (2) triable issues of fact remain with respect to NMV's alleged transfer of Litho's "goodwill" to a third party

---

[1]    Tenet is the parent company of TH Hospitals.

without consideration; and (3) the partnership agreement did not and as a matter of law could not permit NMV to withhold partnership funds to defend and indemnify itself against allegations that it breached its fiduciary duty. Plaintiffs also contend that the trial court erred in sustaining demurrers to certain causes of action in their first and second amended complaints. We affirm.

## I. Factual Background

Tenet operates general hospitals in the United States through a number of subsidiaries and affiliates that include TH Hospitals[2] (an operating company subsidiary), NMV, and Community Hospital of Los Gatos (Community Hospital). Former defendant HCP, Inc. is a real estate investment trust. Former defendant Health Care Property Partners (HCPP) is a California partnership that owns hospital properties in North America and leases them to operating companies like TH Hospitals. HCPP owned the land and buildings that Community Hospital occupied under the terms of a lease between HCPP and TH Hospitals (the Master Lease). TH Hospitals assigned the Master Lease to Community Hospital in 2002.

Lithotripsy is a medical procedure that uses shock waves generated by a machine called a lithotripter to break up kidney stones. Litho was formed in 1985 to develop a kidney stone treatment center utilizing a lithotripter "and to generate profits through the lease or operation of such Center." Litho was in essence a profit-sharing arrangement between a hospital corporation and a group composed primarily of physicians. Litho did not perform lithotripsy procedures; only licensed physicians can do so. As more specifically stated in its 1995 and 2001 amended and restated partnership agreements, Litho's purpose was to provide certain non-physician clinical, management and

---

[2]     TH Hospitals was formerly known as NME Hospitals, Inc. We refer to both entities as TH Hospitals.

2

administrative services to Community Hospital in connection with the hospital's kidney stone treatment center, which contained a lithotripter owned by the hospital.

Three agreements controlled the parties' business dealings. The partnership agreement governed the relationship between NMV and Litho's limited partners. NMV was the sole general partner. NMV was also a limited partner, and it held a majority of the partnership shares at all relevant times. Sixty-two limited partners held the remaining shares. The partnership agreement provided that NMV as general partner had exclusive control over the management of partnership affairs.

The second agreement was the Center Use Agreement (CUA) between Litho and TH Hospitals. The CUA granted Litho a license to use the space and equipment in Community Hospital's Lithotripsy Center and the services of one operating room nurse to provide services to the hospital's patients. The CUA made Litho's license to use the Center "subject and subordinate to all of the terms and provisions of" the Master Lease between HCPP and TH Hospitals and the rights of HCPP as lessor under that Master Lease. The CUA provided that it would "automatically" terminate on December 31, 2015, or on the date of Litho's dissolution, "whichever is earlier."

The third agreement was the Lithotripsy Services Agreement (LSA) between Litho, NMV, and TH Hospitals. By that agreement, TH Hospitals engaged Litho as an independent contractor to administer, manage, and operate the Lithotripsy Center, but only for patients with non-government-funded insurance. Patients with Medicaid, Medicare, or other government-funded insurance received the same lithotripsy services from the same non-physician personnel in the same space at Community Hospital, but those services were provided by TH Hospitals rather than by its independent contractor Litho. The LSA provided that it would terminate "in the event that the [CUA] is terminated for any reason."

The LSA made TH Hospitals responsible for billing and collection for services that the Lithotripsy Center provided. Patients with non-government-funded insurance

3

who were referred for lithotripsy treatment registered at Community Hospital as outpatients. The patients' own physicians performed the procedures, using the Center's operating room and equipment and the technical and administrative services provided by Litho. The physicians separately billed their patients or the patients' insurers for professional services, while TH Hospitals billed for the facility fee or "'technical component'" of services rendered by the Center. TH Hospitals retained a percentage of Litho's portion of the gross receipts collected "as compensation for its billing expense and for the supplies provided." It remitted the remainder to Litho.

NMV had since Litho's formation maintained Litho's funds in a separate partnership bank account. In late 2003, Tenet decided to move all Tenet-related entities into a single accounts payable application. The change, which was made to reduce the risk of fraud, required the consolidation of funds maintained in small bank accounts all over the country into a single corporate-level bank account. On November 29, 2004, NMV transferred $1.7 million from Litho's bank account to a Tenet account that also held funds from other Tenet affiliates. After the transfer, NMV continued to account for the expenses, revenues, and distributions of Litho as it had done before the transfer, and it continued to make distributions to the limited partners according to the terms of the partnership agreement.

The limited partners were notified of the bank account change in early 2005 and raised no objections until mid-2007, when certain limited partners asked NMV to reestablish a separate partnership account. NMV did so in February 2008. On March 17, 2008, NMV transferred Litho's funds to the new account with the interest the funds would have earned had they remained in the original Bank of America money market account.

In June 2008, Community Hospital gave notice to HCPP that it would not exercise its option to renew the Master Lease but would instead let it expire on May 31, 2009.

4

Litho was dissolved on December 31, 2008 by the vote of NMV, which held a majority of the outstanding partnership shares. The CUA automatically terminated on Litho's dissolution, and the CUA's termination triggered the termination of the LSA. NMV proceeded to wind up the partnership business. It sent a distribution summary to the limited partners with a distribution in March 2009 and made a second distribution in May 2009. Pursuant to a provision in the partnership agreement, NMV retained $500,000 to defend and indemnify itself against a pending class action lawsuit that limited partner and former Litho medical director Domenico Manzone, M.D. had filed in January 2008 (the *Manzone* action).

In December 2008, HCPP sold the land, buildings, and equipment that Community Hospital had used to El Camino Hospitals.

Between January 1 and April 10, 2009, Community Hospital continued to provide lithotripsy services to patients with government-funded insurance. It also provided lithotripsy services to patients with non-government-funded insurance, using its own space, equipment, and non-physician personnel. Community Hospital ceased operations on April 10, 2009. The Master Lease that Community Hospital had elected not to renew expired on May 31, 2009.

## II.  Procedural Background

The *Manzone* action that was filed against NMV and Litho in 2008 sought declaratory and injunctive relief for alleged breach of contract, breach of fiduciary duty, and conversion in connection with the operation and management of Litho. In 2009, the limited partners filed a lawsuit against Tenet, TH Hospitals, Community Hospital, NMV, and Litho that alleged similar causes of action and added others relating to the dissolution of Litho (the *Allison* action). The *Manzone* and *Allison* cases were consolidated in November 2009, with *Allison* designated as the lead case.

5

In December 2009, the trial court overruled demurrers to certain causes of action that the original *Allison* complaint asserted against NMV. The court sustained demurrers to causes of action against Tenet, TH Hospitals, and Community Hospital. Plaintiffs filed a first amended complaint. The court sustained a demurrer to a cause of action against newly-added defendants HCP, Inc. and HCPP without leave to amend. It overruled a demurrer to a cause of action against TH Hospitals for breach of contract and sustained demurrers to other causes of action against TH Hospitals.

Plaintiffs filed a second amended complaint. In October 2010, the trial court sustained demurrers to various causes of action against NMV and TH Hospitals without leave to amend. Because no valid causes of action remained against Tenet or Community Hospital, the court entered a several judgment for their dismissal. HCP, Inc. and HCPP were also dismissed. This court affirmed the dismissals of those four parties. (*Allison v. HCP, Inc.* (Jan. 15, 2013, H037045 [nonpub. opn.].)

In August 2012, defendants moved for summary judgment or summary adjudication of the surviving causes of action: plaintiffs' first, second, fourth, and fifth causes of action against NMV for breach of the partnership agreement, breach of fiduciary duty, conversion, and unjust enrichment and their sixth cause of action against TH Hospitals for breach of the LSA. The trial court granted the motion. In a detailed written order, the court described the facts as "mostly undisputed." The court found that the factual disputes that plaintiffs identified were either contradicted by the allegations of their complaint, unsupported by citation to any evidence, or "mostly argument." Thus, they were "not material disputes that would justify denying summary judgment/adjudication." The court entered judgment in favor of defendants, and plaintiffs filed a timely notice of appeal.[3]

---

[3] Plaintiffs elected to proceed in this court without a record of the oral proceedings in the trial court.

## III.  Discussion

The issues on appeal relate to the grant of summary judgment and to the earlier sustaining of demurrers to plaintiffs' first and second amended complaints.  We begin with the issues relating to the grant of summary judgment.  Those issues can be divided into three categories.  The first category of issues involves NMV's decision to transfer Litho's funds to a Tenet-controlled bank account and whether that constituted a breach of the partnership agreement, a breach of fiduciary duty, and conversion by NMV and/or a breach of the LSA by TH Hospitals.  The second category involves NMV's decision to withhold $500,000 in partnership funds to defend and indemnify itself against the *Manzone* lawsuit and whether that constituted a breach of NMV's fiduciary duty.  The third category involves plaintiffs' assertion that Litho possessed a "goodwill" asset that NMV improperly transferred to a third party without consideration to the limited partners and whether that constituted conversion, breach of the partnership agreement, and breach of fiduciary duty by NMV.

## A.  Summary Judgment:  Standard of Review

"'"Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo."'" (*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 993.)  When the defendant moves for summary judgment, the defendant bears both the initial burden of production and the burden of persuasion.  The "initial burden of production [requires the defendant] to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  "A prima facie showing is one that is sufficient to support the position of the party in question." (*Aguilar*, at p. 851.)  "'The plaintiff . . . may not rely upon the mere allegations or

7

denials' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' [Citation.]" (*Aguilar*, at p. 849.) The burden of persuasion requires the defendant to show that there are no triable issues of material fact and that the defendant is entitled to judgment as a matter of law. (*Aguilar*, at p. 850.)

## B.  Plaintiffs' Contentions

Plaintiffs do not challenge the sufficiency of defendants' initial showing. Thus, they have forfeited any argument that defendants did not satisfy their initial burden to show that one or more elements of each of plaintiffs' causes of action could not be established or that there was a complete defense to each. (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1084.) We therefore proceed directly to plaintiffs' contentions that triable issues of fact exist with respect to NMV's transfer of Litho's funds to a Tenet-controlled bank account, its withholding of $500,000 to defend and indemnify itself against the *Manzone* lawsuit, and its alleged transfer of Litho's "goodwill" to a third party without consideration to the limited partners.

### 1.  Transfer of Litho's Funds
### a.  Alleged Breach of Contract by NMV

The second amended complaint alleged that NMV breached the partnership agreement by transferring Litho's funds to a Tenet-controlled bank account for 40 months and "accept[ing] less than 1% interest for the use of Litho's money over that time." Defendants argued on summary judgment that plaintiffs could not establish the required element of damages since it was undisputed that the funds were returned to a separate bank account with the interest they would have earned had they remained in the original money market account. The trial court ruled in defendants' favor.

Plaintiffs challenge this ruling. They characterize the funds transfer as a "forced loan" to Tenet. They argue that there remains a triable issue on the "appropriate" rate of interest for Tenet's "use" of the funds. We disagree.

Plaintiffs' argument that Litho was entitled to a higher "commercial loan" rate of interest depends entirely on their characterization of the funds transfer as a "forced loan." The trial court properly concluded that there was no evidence "that anyone considered the funds to be a loan to Tenet" or that those funds were ever unavailable for Litho's use. Thus, plaintiffs failed to raise a triable issue about the "appropriate rate of interest" for Tenet's "use" of Litho's funds.

Plaintiffs argue that their expert C. Daniel Vencill, Ph.D. opined "that Tenet's loan [was] an uncollateralized commercial loan and not a money market savings account." Not so. Dr. Vencill's opinion that money market interest rates are not appropriate for uncollateralized commercial loans was expressly based on his *assumptions* that "the loan was from [Litho] to [Tenet]; that the loan was uncollateralized and used by [Tenet] in matters unrelated to [Litho]; [and] that the loan was undocumented, without a promissory note, loan agreement, promise of repayment, or stipulated term . . . ." Assumptions do not suffice to create triable issues of fact. (See *Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145 (*Dollinger*) ["[A] party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact.'"].) Absent evidence that the funds transfer was a commercial loan that entitled Litho to a higher rate of interest, plaintiffs did not raise a triable issue of fact about the "appropriate rate," nor can they establish damage resulting from the transfer. Thus, the funds transfer gives them no basis for avoiding summary adjudication of their breach of contract cause of action against NMV.

9

### b. Alleged Breach of Fiduciary Duty by NMV

The second amended complaint alleged that the transfer of Litho's funds to a Tenet-controlled bank account was a breach of NMV's fiduciary duty to Litho and/or to its minority limited partners. Defendants argued on summary judgment that plaintiffs could not establish damages since it was undisputed that the funds were returned with interest. The trial court ruled in defendants' favor.

Plaintiffs assert that it is "clear" that NMV violated paragraph 2.5 of the partnership agreement, "which is the parties' definition of fiduciary duty." We cannot agree. Paragraph 2.5 provided that "[t]he General Partner shall have a fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership, whether or not in the General Partner's possession or control, and shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership." Plaintiffs offered no evidence that Litho's funds were ever used for anything other than the exclusive benefit of the partnership during the 40 months that they remained in the Tenet-controlled account. They offered no evidence that the funds were unavailable for Litho's use or that they were ever at risk in any way during those 40 months. There was no evidence that NMV breached its fiduciary duty.

Even if we assume there was, plaintiffs did not raise a triable issue about resulting damage, which is another essential element of a cause of action for breach of fiduciary duty. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis*).) They assert that "[t]he fact of damage is established by proof that [Litho] received substantially less interest for the use of its funds than the law and the facts warrant." This is the same argument they raised with respect to their breach of contract cause of action, and it fails for the same reasons. There was no evidence that the transfer of Litho's funds to a Tenet-controlled account was a "forced loan" that should have earned more than the money market rate of interest. Plaintiffs' factually-unsupported assertion that the transfer was a

10

loan did not create a triable issue about the appropriate rate of interest for Tenet's alleged use of Litho's funds.

Plaintiffs argue that *Enea* v. *Superior Court* ( 2005) 132 Cal.App.4th 1559 (*Enea*) is directly on point. We disagree. *Enea* involved a partnership whose sole asset was a building that had been converted into offices. One partner sued his copartners for renting parts of the building to themselves at below-market rents. This court held that the fiduciary duties imposed on partners by operation of law "unquestionably" prohibited the defendants from conferring benefits on themselves at the partnership's expense. (*Id.* at p. 1561.) "The advantage consisted of occupying partnership property at below-market rates, i.e., less than they would be required to pay to an independent landlord for equivalent premises. The cost to the partnership was the additional rent thereby rendered unavailable for collection from an independent tenant willing to pay the property's value." (*Id.* at p. 1564.)

This case is nothing like *Enea*. Plaintiffs offered no evidence that NMV engaged in self-dealing when it transferred the funds to a Tenet-controlled account or that it received any benefit from the transfer. They offered no evidence that the transfer was detrimental to Litho or to the minority limited partners. To the contrary, plaintiffs admitted that NMV continued to account for expenses and revenues after the transfer in the same way as it had always done. Plaintiffs also admitted that they received all distributions to which they were entitled. *Enea* is inapposite.

Without evidence that NMV engaged in self-dealing or that Litho suffered damage, plaintiffs failed to raise a triable issue of fact relating to NMV's alleged breach of fiduciary duty. The transfer of Litho's funds gives them no basis for avoiding summary adjudication of their breach of fiduciary duty cause of action against NMV.

### c. Alleged Conversion by NMV

The second amended complaint alleged that NMV converted Litho's funds when it transferred them to a Tenet-controlled account. Defendants argued on summary

11

judgment that plaintiffs could not establish the required element of damages. The trial court ruled in defendants' favor.

Plaintiffs maintain that they were damaged by the alleged conversion because the "appropriate rate of interest" was not paid. The argument fails for reasons we have already explained. In the absence of any evidence that the funds transfer was a "forced loan" that should have earned more than the money market rate of interest, plaintiffs cannot establish damages resulting from the claimed conversion.

*Watson v. Stockton Morris Plan Co.* (1939) 34 Cal.App.2d 393 (*Watson*) does not compel a different conclusion. In *Watson*, the defendant savings and loan and one Mrs. Thomas "conspired to defeat the plaintiff's just claim for reimbursement of $2,287.87, paid by him at the request of Mrs. Thomas to satisfy her promissory note," which she had secured with an assignment of her savings account passbook. (*Id*. at pp. 396, 403.) On appeal from judgment in the plaintiff's favor, the court held that the savings and loan company's issuance of a duplicate passbook to Mrs. Thomas and its payment to her of the funds in the savings account (minus several hundred dollars withheld for itself) constituted conversion of monies belonging to the plaintiff. (*Id.* at p. 402.) The court rejected the plaintiff's argument that he was entitled to recover the entire $4,994.26 converted. Applying Civil Code section 3336, the court awarded the plaintiff the amount he had paid to retire the note, plus interest from the date of the conversion. (*Watson*, at p. 399-400.)

*Watson* does not advance plaintiffs' position because the result in that case is entirely consistent with the result here. In both cases, the plaintiffs were compensated by "an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of . . . ." (Civ. Code, § 3336.) Plaintiffs' reliance on *Watson* is misplaced. The transfer of Litho's funds to a Tenet-controlled account gives plaintiffs no basis for avoiding summary adjudication of their conversion cause of action against NMV.

12

### d. Alleged Breach of Contract by TH Hospitals

The second amended complaint alleged that TH Hospitals breached the LSA "by leaving all of Litho's net revenues in a Tenet account" for 40 months instead of "paying" them to Litho as the agreement required. The complaint demanded that TH Hospitals return the "substantial payments" it received for billing and collecting Litho's revenues while "TH Hospitals was paying those collected revenues not to [Litho] but to a Tenet affiliate." Defendants argued on summary judgment that this cause of action was defective because it was undisputed that TH Hospitals performed the required billing and collection services and properly recorded all amounts due Litho by an accounting credit on Litho's books. The trial court ruled in defendants' favor.

Plaintiffs argue that a triable issue of fact remains "on whether TH Hospitals is liable to [Litho] or [Litho's] minority partners for breach of the [LSA] in the matter of the forty-month use of [Litho's] funds by TH Hospitals' parent company." They argue that "TH Hospitals' breach of this provision permitted the parent company to hold [Litho's] funds at less than market rates for forty months." We disagree.

Plaintiffs' argument lacks merit for several reasons. First, there was no evidence that TH Hospitals breached the LSA, which required TH Hospitals to perform all billing and collection services for Litho. The agreement provided that "all gross receipts" (less a percentage retained by TH Hospitals as compensation for its services) "shall be paid" to Litho and that "[s]uch payments shall be made . . . on or before the twenty-fifth (25th) day of each month with respect to collections actually received . . . during the immediately preceding month." Nothing in the language of the agreement required the "payments" to be "made" to Litho by cutting a paper check and depositing it in a separate Litho bank account as opposed to recording an accounting credit on Litho's books. Further, it was undisputed that during the 40 months when Litho had no separate bank account, it "always had a receivable from the hospital on paper, meaning an accounting entry indicating how much money Litho was owed."

13

Second, even if plaintiffs could establish a breach of the agreement, there was no evidence of resulting damage. Plaintiffs nowhere explain how they were harmed by Tenet's mere "hold[ing]" of Litho's funds, which were at all times accurately recorded as such. To the extent plaintiffs claim that Tenet "used" those funds, they produced no evidence that anyone believed the funds were a loan, that the funds were unavailable for Litho's use, or that they were ever used for any purpose unrelated to Litho. In sum, plaintiffs failed to produce evidence raising a triable issue of fact about TH Hospital's alleged breach of the LSA. Thus, the transfer of Litho's funds to a Tenet-controlled account gives them no basis for avoiding summary adjudication of their breach of contract cause of action against TH Hospitals.

## 2. NMV's Withholding of $500,000 from Distribution

The second amended complaint alleged that NMV breached the partnership agreement and breached its fiduciary duty by withholding $500,000 from distribution to defend and indemnify itself against the *Manzone* litigation "notwithstanding that California law permits no nullification of fiduciary duty, not even by explicit contractual provisions." Defendants argued on summary judgment that the partnership agreement expressly entitled NMV to defend and indemnify itself. The trial court ruled in defendants' favor.

Plaintiffs complain that the trial court erred when it "impliedly accepted defendant NMV's interpretation of Paragraph XI" of the partnership agreement, and they urge us to "interpret Paragraph XI to exclude indemnification for breach of fiduciary duty." We decline to do so.

The interpretation of a written instrument is "solely a judicial function . . . unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) A reviewing court must "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "[T]he intention of the parties is to be

14

ascertained from the writing alone, if possible." (Civ. Code, § 1639.) "'Where the language of a contract is clear and not absurd, it will be followed.'" (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953.)

Plaintiffs do not argue that the language of the partnership agreement is unclear, and we do not think it is. Paragraph XI is headed "Indemnification." Under the subheading "Indemnification of General Partner," it provides in pertinent part that Litho "shall indemnify, defend, and hold harmless the General Partner . . . from and against any loss, liability, damage, cost or expense (including legal fees and expenses . . . ) arising from actions or omissions concerning business or activities undertaken by or on behalf of the Partnership from any source including, without limitation, any demands, claims or lawsuits initiated by a Limited Partner . . . so long as: (i) the General Partner has determined, in good faith, that such acts or omissions were in the best interests of the Partnership; (ii) such liability or loss was not the result of gross negligence or gross misconduct by the General Partner; and (iii) the amounts recoverable are recoverable only out of the assets of the Partnership and not from the Limited Partners." This is very broad language. It expressly shields NMV in its dealings on behalf of the partnership against *any* liability "*from any source*," including "*without limitation*, *any* . . . lawsuits initiated by a Limited Partner . . . ." (Italics added.)

Plaintiffs contend that paragraph XI does not address fiduciary duties because it does not contain the word "fiduciary." We disagree. In our view, the contract language is broad enough to include indemnification for alleged breaches of NMV's fiduciary duties. Moreover, we think the language clearly expresses the parties' intent to apply the business judgment rule to NMV's decisions.

The business judgment rule "is most commonly applied to corporations." (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 711-713 (*Lee*).) It "'establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by directors in good faith

15

and in the absence of a conflict of interest. [Citations.]' [Citation.] ' "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.' [Citation.]" ' [Citation.]" (*Berg & Berg Enterprises, LLC* (2009) 178 Cal.App.4th 1020, 1045 (*Berg*); Corp. Code, § 309.) However, "[a]n exception to the presumption afforded by the business judgment rule . . . exists in 'circumstances which inherently raise an inference of conflict of interest,' and the rule 'does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest.' [Citations.]" (*Berg*, at p. 1045.)

Courts have extended the business judgment rule to limited partnerships and to mutual insurance companies. (*Lee*, *supra*, 50 Cal.App.4th at pp. 711-713; e.g., *Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 402-403, *Wallner v. Parry Professional Bldg., Ltd.* (1994) 22 Cal.App.4th 1446, 1453-1454.) In extending the rule to mutual insurance companies, the *Lee* court rejected the plaintiffs' "contention that the business judgment rule should not apply to reciprocal insurers because the boards . . . are the agents of the subscribers and have fiduciary duties to them . . . ." (*Lee*, at p. 712.) "The contention . . . is without a legal basis. The existence of a fiduciary relationship between the board and the participants in an enterprise has never precluded application of the rule. For example, the courts have applied the business judgment rule to limited partnerships, although general partners are held to be agents and fiduciaries of the limited partners. [Citations.]" (*Ibid.*) "Where the reason is the same, the rule should be the same." (*Lee*, at p. 713.)

Here, the express language of paragraph XI shielded NMV from "any" liability for acts or omissions concerning business or activities undertaken by or on behalf of the partnership so long as NMV determined "in good faith" that its acts or omissions were in Litho's best interests and so long as the liability or loss was not the result of gross negligence or gross misconduct by NMV. This language is in essence a statement of the business judgment rule. As such, it expressed the parties' clear intent to apply that rule to

16

Litho's and NMV's actions. We reject plaintiffs' contention that paragraph XI excluded indemnification for alleged breaches of fiduciary duty.

As a fallback argument, plaintiffs contend that "[a] triable issue of material fact exists on NMV's entitlement to indemnification against Manzone's suit on the forty month loan and this even under the terms and conditions of Paragraph XI." They claim that there remains a triable issue of fact on whether NMV in good faith believed that the transfer of Litho's funds to a Tenet-controlled account was in the best interests of Litho. We disagree.

The record contains no evidence that NMV transferred Litho's funds to the Tenet-controlled account for any reason other than to reduce the risk of fraud. Plaintiffs submitted no evidence that anyone connected with NMV believed that the transfer was *not* in the best interests of Litho. On the contrary, plaintiffs acknowledge that "[r]epresentatives of NMV will testify that they believed in good faith that the [transfer] was in the best interest of [Litho] . . . ." On this record, plaintiffs have no basis for arguing that NMV was not entitled to withhold $500,000 from distribution to defend and indemnify itself against the *Manzone* litigation. Thus, the withholding of those funds gives plaintiffs no basis for avoiding summary adjudication of their breach of contract and breach of fiduciary duty causes of action against NMV.[4]

### 3. Alleged Transfer of Litho's "Goodwill" Without Consideration

The second amended complaint alleged that NMV breached the partnership agreement, breached its fiduciary duty, and converted Litho's property to its own or a third party's use when it "failed to negotiate a reasonable figure for the goodwill of Litho" and failed to pay the limited partners their share of that figure on dissolution.

---

[4] Plaintiffs do not challenge the trial court's grant of summary adjudication in favor of defendants on their unjust enrichment cause of action against NMV. Because that cause of action was derivative of their breach of contract and breach of fiduciary duty causes of action, it also fails. The trial court properly so concluded.

17

Defendants argued on summary judgment that Litho had no goodwill of its own because it was merely an independent contractor serving a subset of the hospital's patients, using space and equipment that it leased from the hospital on a non-exclusive basis. The trial court ruled in favor of defendants.

Plaintiffs maintain that Litho "possessed a valuable goodwill asset on December 31, 2008" and that NMV transferred Litho's business and goodwill to Community Hospital without consideration to Litho or its limited partners. They argue that there remain triable issues of fact (1) "on whether NMV converted and misappropriated to its own use or the use of an affiliate of NMV the goodwill of ]Litho]"; (2) "on whether NMV violated the Partnership Agreement by transferring [Litho's] business and goodwill to an affiliate of NMV without requiring payment for [Litho's] goodwill"; and (3) "on whether NMV breached its fiduciary duty to [Litho] or to [Litho's] minority partners by transferring [Litho's] business and goodwill to an affiliate of NMV without requiring payment for [Litho's] goodwill." We disagree.

"The 'good will' of a business is the expectation of continued public patronage." (Bus. & Prof. Code, § 14100.) " 'Good will has been defined "to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances, or necessities, or even from ancient partialities or prejudices. [Citation.] . . . [I]t is the probability that the old customers will resort to the old place. It is the probability that the business will continue in the future as in the past, adding to the profits of the concern and contributing to the means of meeting its engagements as they come in."' [Citations.]" (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1097-1098, fn. 6 (*McTiernan*), quoting *Metropolitan Bank v. St. Louis Dispatch Co.* (1893) 149 U.S. 436, 446.)

18

"The good will of a business is property and is transferable." (Bus. & Prof. Code, § 14102.) However, "'[i]t is tangible only as an incident, as connected with a going concern or business having locality or name, and is not susceptible of being disposed of independently.'" (*McTiernan*, *supra*, 133 Cal.App.4th at p. 1097.) Goodwill "d[oes] not exist in the abstract, apart from a business." (*Ibid.*) For purposes of Business and Professions Code section 14100 et seq., "'a business' . . . means a professional, commercial or industrial enterprise with assets." (*McTiernan*, at p. 1098.) "'[A] business' is not earning capacity or professional reputation." (*Id.* at p. 1102.) "The existence of goodwill is a question of fact." (*In re Marriage of Slivka* (1986) 183 Cal.App.3d 159, 162 (*Slivka*).)

Here, plaintiffs' goodwill arguments fail because Litho was not "a professional, commercial or industrial enterprise with assets." (*McTiernan*, *supra*, 133 Cal.App.4th at p. 1098.) Thus, it was not a "business" within the meaning of Business and Professions Code section 14100 and therefore, it possessed no goodwill of its own. (*Slivka*, *supra*, 183 Cal.App.3d 159 at pp. 162-164 [physician's partnership interest in a medical group had no value "and a fortiori no goodwill value" where the medical group contracted with a health maintenance organization to perform services and had no other patient base; vis-à-vis the Kaiser network, the husband's situation was "most similar to an employee who has no ownership interest and is paid for services rendered."].) It was undisputed that Litho owned no equipment after its 1995 restructuring. It was also undisputed that it acted as an independent contractor at Community Hospital after 1995, providing non-physician administrative and technical services to a subset of the hospital's patients in the hospital's space and with the hospital's equipment under a nonexclusive lease. The patients that Litho served were registered as hospital outpatients. Litho was compensated with the amounts (less TH Hospitals' fee for billing and collection) that TH Hospitals collected from the patients or their non-government-funded insurers. On these facts, Litho was simply a provider of services, not a "professional, commercial or industrial

19

enterprise with assets." (*McTiernan*, at p. 1098.) It had no assets and for that reason was not a "business" that could generate its own goodwill. (*Slivka*, at pp. 162-163; Bus. & Prof. Code, § 14100.) Moreover, under its arrangement with Community Hospital, Litho provided services only in accordance with the CUA and LSA. The CUA automatically terminated on Litho's dissolution, and the LSA terminated concurrently with the CUA. As the trial court correctly concluded, Litho could not have had any expectation of continued public patronage after that point because its sole purpose had ceased to exist.

Plaintiffs argue that Litho was a business because it had "all the attributes and indicia of a business to which goodwill attaches: capital contributions of the partners . . . , a long history of profits . . . , employees . . . , assets used in the business . . . , and transferability." They advanced this same argument below, relying on *assumptions* that Dr. Vencill described in his declaration. Dr. Vencill's assumptions are not evidence and they are insufficient to create a triable issue of fact. (*Dollinger*, *supra*, 199 Cal.App.4th at pp. 1144-1145.) In any event and as the trial court properly ruled, the factors that Dr. Vencill listed were "irrelevant to the legal analysis in *McTiernan* regarding the term 'business' for purposes of Business and Professions Code section 14102."

We agree with the trial court's conclusion. We have found no authority for the proposition that the "indicia" plaintiffs identify define a "business" with distributable goodwill. Even if such a test existed in the case law, plaintiffs could not satisfy it because it was undisputed that Litho had no assets on dissolution. The fact that Litho was not a "business" for purposes of Business and Professions Code sections 14100-14012 is fatal to plaintiffs' contention that Litho possessed a goodwill asset at dissolution.

The cases that plaintiffs summarize do not compel a different conclusion. In none of those cases was a partnership without assets held to be a business that possessed goodwill. In none of those cases was a partnership that was no longer an ongoing

20

concern held to possess distributable goodwill. None of those cases alters our conclusion that in this case and as a matter of law, Litho possessed no goodwill distributable at dissolution because it was neither a "'a professional, commercial or industrial enterprise with assets" nor an ongoing concern. (*McTiernan*, *supra*, 133 Cal.App.4th at p. 1098; *Slivka*, *supra*, 183 Cal.App.3d at p. 162.)

Plaintiffs argue that Litho's business did not cease to exist on December 31, 2008 but instead "continued after the de facto dissolution without missing a beat." They assert that NMV transferred Litho's business to Community Hospital on that date and that Community Hospital operated it for the next three months using Litho's goodwill, space, equipment, and personnel. Plaintiffs raised this argument below and the trial court rejected it, noting among other things that plaintiffs could not raise a triable issue of fact "by simply characterizing leased space and equipment as belonging to Litho." We agree. It was undisputed that Litho did not own any equipment after its 1995 restructuring but instead leased Community Hospital's space and equipment on a non-exclusive basis. It was also undisputed that whether lithotripsy services were provided directly by Community Hospital or alternatively through its independent contractor Litho, those services were provided in the same space, by the same personnel, and with the same equipment. The fact that Community Hospital declined to contract with another independent contractor after Litho's dissolution and instead provided lithotripsy services directly to all of its patients for three months before it ceased operations does not mean that *Litho's* business activity continued after its dissolution.

To bolster their argument that Litho's "goodwill or customer base stayed with the business" after Litho's dissolution, plaintiffs point out that 28 of the 29 doctors (including former physician limited partners of Litho) who used the Lithotripsy Center in the three months between Litho's dissolution and the hospital's closing were former patrons of the Center. Although this fact was undisputed, it does not advance plaintiffs' position. On the contrary, it illustrates the physicians' belief that *Community Hospital's* competitive

merits in providing lithotripsy services warranted their continued patronage. We agree with the trial court that the physicians' continued patronage "demonstrate[d] that the probability of old customers resorting to the old place -- [Community Hospital's] Lithotripsy Center -- remained high even after [Litho] no longer existed." Thus, their continued patronage undermined rather than supported plaintiffs' theory about Litho's goodwill.

Plaintiffs argue that paragraph 10.3(a) of the partnership agreement contains a formula for calculating the value of Litho's goodwill, and they further contend that this formula "constitutes a written agreement of the parties to this case—NMV and the minority partners—that [Litho] can have goodwill if the profits are there and that a fair and reasonable way of calculating the value of that goodwill is to take profits in the year before the valuation date and multiply by five . . . ." We disagree.

Plaintiffs' characterization misconstrues paragraph 10.3(a). That paragraph appears under the heading "OPTION TO PURCHASE A PARTNERSHIP INTEREST." It provides a formula for calculating the price per partnership unit to be paid to a limited partner who because of bankruptcy, divorce or marital separation, loss of his or her medical license, or other "Terminating Event" wishes to withdraw from the partnership while the business is ongoing. Paragraph 10.3(a) says nothing about the payment of goodwill on dissolution of the partnership. The formula has no application here. We conclude that trial court did not err when it determined that Litho had no goodwill at dissolution. Thus, NMV's alleged failure to negotiate a reasonable figure for and to pay the limited partners their share of that "goodwill" gives plaintiffs no basis for avoiding summary adjudication of their breach of contract, breach of fiduciary duty, and conversion causes of action against NMV.

The foregoing discussion leaves plaintiffs with no basis for avoiding summary adjudication on their causes of action against NMV for breach of the partnership agreement, breach of fiduciary duty, and conversion and their sixth cause of action

against TH Hospitals for breach of the LSA.  All that remains is their derivative fifth cause of action for unjust enrichment, which cannot stand because it "depends upon a finding [that plaintiffs are entitled to relief] pursuant to some other cause of action . . . ." (*Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 922.)  Thus, the trial court properly granted summary adjudication for defendants on that cause of action as well and entered summary judgment in their favor.

### C.  Standard of Review—Demurrers

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules.  'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]'" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)  "[F]acts appearing in exhibits attached to the complaint will also be accepted as true and, if contrary to the allegations in the pleading, will be given precedence." (*Dodd* v. Citizens Bank of Costa Mesa (1990) 222 Cal.App.3d 1624, 1627.)  "'We also consider matters which may be judicially noticed.' [Citation.] . . . [W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Blank*, at p. 318.) "'Specific factual allegations modify and limit inconsistent general statements.' [Citation.]" (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1371.)  "Where, as here, a demurrer is to an amended complaint, we may consider the factual allegations of prior complaints, which a plaintiff may not discard or avoid by making '"'contradictory averments, in a superseding, amended pleading.'"'" [Citation.]" (*Berg*, *supra*, 178 Cal.App.4th at p. 1034.)

We "review the complaint de novo to determine . . . whether or not the trial court erroneously sustained the demurrer as a matter of law.  [Citation.]" (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879.)  "We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on

23

proper grounds or the defendant asserted a proper ground in the trial court proceedings." (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.)  On appeal, " 'the plaintiff bears the burden of demonstrating that the trial court erred.' [Citation.]" (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1020.) When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." (*Blank*, *supra*, 39 Cal.3d at p. 318.)  "The burden of proving such reasonable possibility is squarely on the plaintiff." (*Ibid*.)  "Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of the pleading." (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636.)  The showing need not be made in the trial court so long as it is made to the reviewing court. (*Dey v. Continental Central Credit* (2008) 170 Cal.App.4th 721, 731; Code Civ. Proc., § 472c.)

### D.  Demurrers to First Amended Complaint

Plaintiffs' first amended complaint included causes of action against TH Hospitals for breach of fiduciary duty and conversion in connection with the transfer of Litho's funds to a Tenet-controlled account.  The trial court sustained demurrers to both causes of action without leave to amend.

#### 1.  Alleged Breach of Fiduciary Duty by TH Hospitals

Plaintiffs claim the trial court erred in sustaining the demurrer to their seventh cause of action alleging breach of fiduciary duty by TH Hospitals.  We disagree.

"The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis*, *supra*, 51 Cal.4th at p. 820.)  "The allegation of a fiduciary relationship must be supported by either a contract or a relationship that imposes it as a matter of law.  [Citation.]" (*Berryman v.*

24

*Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1558.) "[T]he contractual right to contingent compensation in the control of another has never, by itself, been sufficient to create a fiduciary relationship where one would not otherwise exist. [Citations.]" (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 30-31.) "Every contract requires one party to repose an element of trust and confidence in the other to perform. For this reason, every contract contains an implied covenant of good faith and fair dealing, obligating the contracting parties to refrain from ' "doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." ' [Citations.] 'Being of universal prevalence, [the implied covenant] cannot create a fiduciary relationship; it affords basis for redress for breach of contract and that is all.' [Citation.]" (*Id*. at p. 31.)

"While breach of fiduciary duty is a question of fact [citation], the existence of a legal duty in the first instance and its scope are questions of law." (*Kirschner Brothers Oil, Inc. v. Natomas Co.* (1986) 185 Cal.App.3d 784, 790.)

Here, plaintiffs premised the existence of a fiduciary relationship entirely on the LSA. The complaint averred that TH Hospitals was the agent of Litho "for the billing of [Litho's] services and the collection of those bills" and that "[a]s [Litho's] agent, TH Hospitals owed a fiduciary duty to [Litho]." This allegation was contradicted by the LSA, which plaintiffs attached as an exhibit to the complaint. Paragraph 12.1 of the LSA expressly provided that Litho "is and at all times shall be, acting as an independent contractor . . . ." That statement in the agreement takes precedence over plaintiffs' contradictory allegation. (*Dodd*, *supra*, 222 Cal.App.3d at p. 1627.) The LSA did not create an agency or a fiduciary relationship between the parties.

Defendants argue that the purpose of the independent contractor provision was to "clarify" that Litho "could not bind TH Hospitals to third parties." Nothing in the agreement's language supports that assertion. Nor do plaintiffs cite any judicially noticeable matter that supports it. They simply argue that "[i]t is quite possible for

25

[Litho] to be the independent contractor of TH Hospitals so that nothing [Litho] did could bind TH Hospitals to third parties, and at the same time for TH Hospitals to be [Litho's] agent for the collection of [Litho's] charges." We reject the argument. There can be no such possibility where the contract language expressly provided that Litho "is and at all times shall be" acting as an independent contractor.

Plaintiffs' reliance on *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566 (*Michelson*) is misplaced. Two surgeons with separate practices agreed to share Hamada's office space. They agreed that Hamada's professional corporation would perform all billing and collection services for Michelson for a fee that included his use of the office space and that Hamada's corporation would deduct the fee from collections received for Michelson's services and remit the remainder to him every month. (*Id.* at p. 1577.) The court concluded that the parties' "written agreements disclose[d] an agency relationship" and that Hamada thus owed a fiduciary duty to Michelson. (*Id.* at p. 1580.) "An agent is classified by the law as a fiduciary and holds a confidential relationship to his principal." (*Gerhardt v. Weiss* (1966) 247 Cal.App.2d 114, 116.)

*Michelson* is factually distinguishable. The parties' agreement in that case "disclosed an agency relationship." (*Michelson*, *supra*, 29 Cal.App.4th at p. 1580.) By contrast here, the LSA provided that Litho was an independent contractor engaged by the hospital to perform certain services for a subset of the hospital's patients. In Michelson, the parties' circumstances and conduct also revealed an agency relationship. Michelson "had not been in business before he met Hamada." (*Id.* at p. 1576.) He "was inexperienced in managing a medical practice and otherwise possessed little business acumen." (*Id.* at p. 1580.) Those facts illustrated his reliance on Hamada, in whom he placed trust and confidence. (*Id.* at pp. 1580-1581.) Hamada encouraged that reliance "by repeatedly expressing pride and confidence in the business organization of the practice and discouraging any participation in management by Michelson." (*Id.* at p. 1580.) No such facts are alleged here. The complaint simply asserted that "TH

26

Hospitals was the agent and Litho the principal in the matter of collection and payment . . . ." It is settled that contentions, deductions and conclusions of fact or law need not be accepted as true on demurrer. (*Blank*, *supra*, 39 Cal.3d at p. 318.) The trial court did not err in sustaining the demurrer to plaintiffs' cause of action for breach of fiduciary duty against TH Hospitals.

Nor did the court abuse its discretion in sustaining the demurrer without leave to amend. The same deficiencies that infect the present cause of action were indentified in the court's ruling on a previous demurrer. Thus, we can presume that the amended pleading stated plaintiffs strongest possible case. (See *Giraldo v. California Department of Corrections and Rehabilitation* (2008) 168 Cal.App.4th 231, 252.) Because the cause of action remained deficient, the demurrer was properly sustained without further leave to amend.

## 2. Alleged Conversion by TH Hospitals

Plaintiffs claim the trial court erred in sustaining the demurrer to their eighth cause of action for conversion against TH Hospitals. We disagree.

Plaintiffs first argue that "[c]onversion follows from an agency relationship." That argument fails because we have already determined that the LSA did not create an agency relationship between TH Hospitals and Litho.

Plaintiffs next argue that "conversion also stands on its own." We disagree that they stated a viable cause of action for conversion.

" 'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion are [1] the plaintiff's ownership or right to possession of the property at the time of the conversion; [2] the defendant's conversion by a wrongful act or disposition of property rights; and [3] damages.' " (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 451 (*Farmers*).) "Money can be the subject of an action for conversion if a specific sum capable of identification is involved." [Citation.] (*Id*. at p. 452.) "Neither legal title nor absolute ownership of the property is necessary.

27

[Citation.]  A party need only allege it is '*entitled to immediate possession at the time of conversion.*  [Citations.]'  [Citation.]  However, a mere contractual right of payment, without more, will not suffice."  (*Ibid*. at p. 452.)

Here, plaintiffs' premised their conversion cause of action on "a mere contractual right of payment."  (*Farmers*, *supra*, 53 Cal.App.4th at p. 452.)  They alleged that defendants violated the LSA by "paying" Litho's funds "into a bank account of TH Hospitals' parent corporation, Tenet," which "caused measurable damage . . . by depriving Litho of the use of those funds . . . ."  As the trial court properly concluded, the cause of action was "exclusively based on and essentially duplicative of" their cause of action against TH Hospitals for breach of contract.  The trial court did not err in sustaining the demurrer to plaintiffs' conversion cause of action against TH Hospitals.

Even were we to conclude that the trial court erred, we would find the error harmless.  First, plaintiffs were not left without a remedy.  Their breach of contract cause of action survived the demurrer stage.  It later failed on summary adjudication because it was undisputed that the transferred funds were returned to a separate bank account in Litho's name with the amount of interest the funds would have earned had they remained in the original money market account.  It was also undisputed that the limited partners received all distributions required by the partnership agreement.  These undisputed facts establish not only that plaintiffs could not prove damages resulting from the alleged breach of contract but also that they would not have been able to establish damages resulting from the alleged conversion, had that cause of action been allowed to proceed.  Thus, any error in sustaining the demurrer was harmless.

### E.  Demurrers to Second Amended Complaint

Plaintiffs' second amended complaint included causes of action against TH Hospitals for breach of contract and against NMV for breach of contract and breach of fiduciary duty in connection with the nonrenewal of the Master Lease between HCPP and

TH Hospitals. The trial court sustained demurrers to those causes of action without leave to amend.

### 1. Alleged Breach of Contract by TH Hospitals

Plaintiffs claim the trial court erred in sustaining the demurrer to their twentieth cause of action for breach of contract against TH Hospitals, which alleged that "[b]y agreeing to give up its lease at Community Hospital . . . , TH Hospitals and its successor in interest have breached paragraph[s] 24.5(c) and (d) of the attached [CUA], causing [Litho] to lose the profits [Litho] would have made between December 31, 2009 and December 31, 2015." The cited paragraphs provided that either "[t]he termination of the Master Lease" between HCPP and TH Hospitals or "[t]he closing of [Community Hospital]" would constitute "a material default and breach" of the CUA by TH Hospitals.

The trial court sustained defendants' demurrer for two independent reasons. First, the court implicitly distinguished a "termination" of the lease from an expiration following a decision to forego a contractual option to extend the lease term. The court found nothing in the CUA that required TH Hospitals to extend the Master Lease for as long as possible. On the contrary, the CUA expressly stated that it was "subject and subordinate to all of the terms and provisions of the Master Lease . . . ." The Master Lease gave TH Hospitals (and Community Hospital, to which TH Hospitals had assigned the Master Lease in 2002) the option to extend *or not to extend* the lease term. We agree with the trial court that "[e]xercising a right expressly given by the Master Lease simply cannot be a breach of the 'subordinate' [CUA]."

Plaintiffs assert that the CUA contained "a promise by TH Hospitals to [Litho] of a term to December 21, 2015." Not so. The argument ignores the plain language of the provision plaintiffs refer to, which is found in the December 31, 1999 Second Amendment of CUA. That provision unambiguously stated: "Term. Section 2.1 of the Agreement shall be replaced and superseded by the following: The term of this Agreement shall commence on the first (1st) day of January, 1995 . . . and, unless

29

terminated earlier as provided herein, shall automatically terminate at midnight on December 31, 2015, *or on such date as the [Litho] California limited partnership dissolves or is terminated, whichever is earlier*." (Italics added.) The CUA did not require TH Hospitals to extend it until December 31, 2015.

Plaintiffs' reliance on *Northridge Hospital Foundation v. Pic 'N' Save No. 9, Inc.* (1986) 187 Cal.App.3d 1088 (*Northridge*) is misplaced. The sublease at issue in *Northridge* provided that it was subject to the master lease and that in the event the master lease would terminate "'for any reason whatsoever,'" the sublease would also terminate, and neither the sublessee or the sublessor would have any right or cause of action against the other "'by reason of such termination.'" (*Id*. at p. 1092.) Contradictorily, the sublease also gave the sublessee "the absolute option to renew" it. (*Id.* at p. 1098.) On those facts, the court construed the contract language against the sublessor who had drafted it, holding that the sublease included "an implied agreement of the sublessor to protect its sublessee, by requiring that the sublessor exercise its option to extend the lease from the owner, in the absence of clear and unequivocal language to the contrary." (*Id.* at pp. 1092, 1098.)

*Northridge* is easily distinguished. Unlike the sublease in *Northridge*, the CUA did not give Litho an absolute option to renew it. Thus, TH Hospitals had no obligation to protect Litho by extending the Master Lease for as long as possible. *Northridge* is inapposite.

As a second and independent ground for sustaining the demurrer, the trial court pointed out that the CUA by its own terms "automatically" terminated upon Litho's December 31, 2008 dissolution, which occurred months before the expiration of the Master Lease. Thus, the CUA was no longer in force when TH Hospitals allegedly breached it. For this reason as well, the trial court properly sustained the demurrer.

Plaintiffs contend that TH Hospitals committed an anticipatory breach of the CUA prior to Litho's dissolution by signing a settlement agreement in litigation unrelated to

30

Litho. They argue that pursuant to that June 30, 2008 settlement agreement, TH Hospitals and HCPP agreed that TH Hospitals would let the Master Lease expire on May 31, 2009, and that HCPP or an affiliate would have an option to purchase the personal property owned by TH Hospitals at Community Hospital. This made it "impossible that TH Hospitals could perform its promises to [HCPP] under the June 30, 2008 Settlement Agreement, and at the same time perform TH Hospitals' promise to [Litho] under the [CUA] for a term to December 31, 2015." We reject the argument.

This court rejected a similar argument on plaintiffs' 2013 appeal from the sustaining of Tenet's and Community Hospital's demurrers to the same cause of action at issue here. (*Allison v. HCP, Inc*., *supra*, H037045.) The court stated that "[w]hile appellants maintain that the earlier decision by [Community Hospital] to not renew the master lease and the granting of an option to HCPP to purchase the equipment was an anticipatory breach [of the CUA], [they have] failed to allege a connection between those earlier decisions and [Litho's] dissolution, which precluded an actual breach from occurring. The trial court did not err in sustaining the demurrer without leave to amend." (*Ibid.*)

The same reasoning applies here. It can reasonably be inferred from the language of the various agreements attached to the complaint that Litho's dissolution, not TH Hospitals' signing of the settlement agreement, triggered the termination of the CUA. Because plaintiffs' second amended complaint alleged no facts to counter that reasonable inference, the trial court did not err in sustaining the demurrer to this cause of action.

Plaintiffs contend that Litho's dissolution "was not effective to terminate the [CUA]." They rely on paragraphs 6.1 and 8.2 of the partnership agreement, which required "the vote of Limited Partners holding at least a majority of the Units then outstanding" to dissolve the partnership. Without citation to any authority, plaintiffs

31

assert that these provisions "require[d] two or more votes for dissolution," but only NMV voted for it. We disagree.

"[I]n construing a contract the court's function is . . . to glean the meaning of the words from the context and usage of the words in the contract itself." (*Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1069, italics omitted.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

Here, the preamble to the partnership agreement stated that ownership in Litho was divided into "units of limited partnership interest." Exhibit A to the agreement named the limited partners and specified how many units each held. The agreement expressly authorized NMV's participation as a limited partner. Importantly, plaintiffs' second amended complaint admitted these facts. They alleged that NMV was a limited partner as well as the general partner, that it held 157 units, or "about 60%" of Litho, and that the other limited partners held 107 units or "about 40%," with some of them holding multiple units and others holding "only a fraction of a share." Against this context, the determinative factor in the phrase "vote or written consent of Limited Partners holding at least a majority of the then outstanding Units" was the number of units, not the number of limited partners holding those units.

As a limited partner holding more than a majority of the outstanding units, NMV was authorized to dissolve the partnership by its unilateral vote. The dissolution of the partnership triggered the termination of the CUA, which was no longer in effect when TH Hospitals allegedly breached it. Thus, the trial court did not err in sustaining the demurrer to plaintiffs' cause of action against TH Hospitals for breach of the CUA.

## 2. Alleged Breach of Contract by NMV

Plaintiffs claim the trial court erred in sustaining the demurrer to their 16th cause of action, which alleged that NMV breached the partnership agreement by failing to sue TH Hospitals "and its successor in interest for lost profits caused . . . by TH Hospitals'

32

breach of paragraph[s] 24.5(c) and (d) of the [CUA] . . . .” We disagree. We find nothing in the partnership agreement that required NMV to sue to redress perceived wrongs. Even if an obligation to sue in certain circumstances could be implied, there could be no breach of that implied obligation here. We have already determined that the trial court did not err in concluding that TH Hospitals did not breach or anticipatorily breach the CUA by declining to exercise its option to renew the Master Lease. Because no cause of action against TH Hospitals arose, NMV could not have breached the partnership agreement by failing to sue TH Hospitals. The trial court properly sustained the demurrer to plaintiffs' breach of contract cause of action against NMV.

### 3. Alleged Breach of Fiduciary Duty by NMV

Plaintiffs claim the trial court erred in sustaining the demurrer to their 17th cause of action, which alleged that NMV breached its fiduciary duty by failing to sue TH Hospitals “and its successor in interest for lost profits caused . . . by TH Hospitals' breach of paragraph[s] 24.5(c) and (d) of the [CUA] . . . .” This contention fails for the same reason plaintiffs' immediately preceding contention fails. Because no cause of action against TH Hospitals arose, NMV did not breach its fiduciary duty by failing to sue TH Hospitals. The trial court properly sustained defendants' demurrer to plaintiffs' cause of action for breach of fiduciary duty against NMV.

### IV. Disposition

The judgment is affirmed.

33

_____

Mihara, J.

WE CONCUR:


_____

Elia, Acting P. J.


_____

Bamattre-Manoukian, J.