Filed 7/25/17 Certified for Publication 8/11/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID HOVANNISIAN, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> FIRST AMERICAN TITLE INSURANCE COMPANY, <br><br> Defendant and Respondent. | F072789 <br><br> (Super. Ct. No. 14CECG02086) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Jeffrey Y. Hamilton, Jr., Judge.

Wilkins, Drolshagen & Czeshinski, James H. Wilkins and Quentin Cedar, for Plaintiffs and Appellants.

Garrett & Tully, Ryan C. Squire and Edward W. Racek, for Defendant and Respondent.

-ooOoo-

David and Linda Hovannisian purchased property from Wells Fargo Bank (Wells Fargo) at a foreclosure sale. Several months later they discovered there was a first priority deed of trust on the property that had not been extinguished by the foreclosure. The Hovannisians sued Wells Fargo for intentional and negligent misrepresentation based

on a statement in Wells Fargo's deed of trust that it was a first deed of trust. Wells Fargo tendered defense of the action to its title insurer, First American Title Insurance Company (First American), which refused to indemnify or defend Wells Fargo. After Wells Fargo assigned any claim it had against First American to the Hovannisians, the Hovannisians sued First American for breach of contract and breach of the implied covenant of good faith and fair dealing. First American subsequently brought a summary judgment motion, arguing that coverage had terminated, there were no benefits due under the policy, and there was a genuine dispute as to coverage. The trial court granted the motion.

On appeal, the Hovannisians contend First American failed to establish that coverage did not continue under the title policy or there were no benefits due under the policy. They also contend triable issues of fact exist regarding their bad faith claim. Finding no merit to these contentions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2006, Wells Fargo's predecessor, World Savings Bank (WSB), made a $120,000 loan to North West Holdings, LP, which was secured by a deed of trust against property located at 639 N. 4th Street, in Fresno (the Wells Fargo DOT). The Wells Fargo DOT stated that it was a "FIRST DEED OF TRUST." In connection with the Wells Fargo DOT, First American underwrote a lender's title insurance policy, which was issued to WSB with an effective date of August 28, 2006. As WSB's successor, Wells Fargo became the insured under the policy.

On January 13, 2012, the Hovannisians purchased the property for $28,792 at a non-judicial foreclosure sale by Wells Fargo.[1] The notice of trustee's sale, which was recorded on December 23, 2011, stated that the property would be sold at public auction to the highest bidder "without warranty express or implied as to title, use, possession or

---

[1] According to the Trustee's Deed, the amount of unpaid debt, together with costs, was $139,400.62.

2.

encumbrances ….." The trustee's deed issued to the Hovannisians stated that the trustee "hereby grants and conveys, but without warranty, express or implied, . . . all of its right, title, and interest" in the property.

In late April 2012, the Hovannisians received a letter from Duane Long, who claimed to own a first lien on the property and requested payment on the note secured by the property. Subsequent investigation revealed that Duane and Margaret A. Long, trustees of the Duane Long and Margaret A. Long Family Trust dated April 5, 1993, held a $38,000 note issued to Golden Trade LLC (the Long note), which was secured by the property through a deed of trust recorded in January 2003 (the Long DOT).

*The Underlying Action*

On May 31, 2012, the Hovannisians, through their attorney, submitted a letter to First American, which stated the Hovannisians were demanding that Wells Fargo pay the Longs the balance of the Long note "so that any cloud on the title can be removed." The Hovannisians claimed that Wells Fargo presented an unencumbered "First Deed of Trust" for foreclosure, which the Hovannisians reasonably relied on to purchase the property at foreclosure, and they reasonably believed they had purchased a title free of any encumbrances. The Hovannisians asked First American to consider the letter either a demand for Wells Fargo to present clear title or a claim on the title policy.

First American informed the Hovannisians on July 9, 2012 that it was unable to assist them, as they were not insureds under the policy and to the extent they were asserting a claim against Wells Fargo, they needed to contact Wells Fargo directly. First American added that even if it had an obligation to the Hovannisians, there were no deed warranties provided to them as a result of the foreclosure, as the property was conveyed "without warranty, express or implied[,]" and therefore they took the property subject to any encumbrances on title.

On October 30, 2012, First American received a written claim from Wells Fargo on the title policy, which was based on a July 19, 2012 demand letter Wells Fargo

3.

received from the Hovannisians' attorney. The Hovannisians demanded that Wells Fargo pay off the balance of the Long note and present them with a clear title, as they had been misled by both First American and Wells Fargo due to the statement in the Wells Fargo DOT that it was a "First Deed of Trust" for foreclosure, which they reasonably relied on to purchase the property. The Hovannisians claimed they reasonably believed the interest being foreclosed was a first deed of trust and that they were purchasing a title free of encumbrances.

First American denied Wells Fargo's claim. In a November 21, 2012 letter, First American explained there did not appear to be any legal merit to the Hovannisians' claims, as both the notice of the trustee's sale and the trustee's deed stated the conveyance was without express or implied warranty. Moreover, Wells Fargo did not have continuing coverage under the policy because it no longer retained an interest in the property. First American advised Wells Fargo to resubmit the claim should the Hovannisians file a lawsuit against it and it wanted First American to consider coverage under the policy.

The Hovannisians filed the underlying action against Wells Fargo on April 30, 2013.[2] They alleged two causes of action – intentional and negligent misrepresentation. These causes of action were based on the following allegations: (1) before January 13, 2012, Wells Fargo initiated foreclosure proceedings on the Wells Fargo DOT pursuant to a trustee sale; (2) the Wells Fargo DOT clearly stated the Wells Fargo lien was the first lien against the property; (3) Wells Fargo recorded a copy of the Wells Fargo DOT with

---

[2] The plaintiffs in the original complaint were the Hovannisians as individuals, and four California limited partnerships – BDHOV, LP; LEHOV, LP; WRHOV, LP; and JDHOV, LP – who were alleged to be successors-in-interest to the Hovannisians. The complaint was later amended to add as a plaintiff the Hovannisians as trustees of the D & L Hovannisian 2012 Revocable Trust, to which the Hovannisians alleged to have quitclaimed the property. The substantive allegations of the First Amended Complaint remained the same.

4.

the specific intent and purpose of inducing potential buyers to bid on and purchase the property at the trustee sale; (4) before sending out the notice of trustee sale, Wells Fargo knew the Wells Fargo DOT was not the first deed of trust on the property; (5) at the January 13, 2012 trustee sale, the Hovannisians made the highest bid and, relying on the affirmative representation on the Wells Fargo DOT, purchased the property with the understanding they bought an interest which had the recorded first position on the property; (6) in late April 2012, they received a letter from Duane Long, who claimed he owned a first lien on the property and requested payment on the note secured by a first deed of trust; and (7) notwithstanding their demands that Wells Fargo reimburse them for the cost and expense to satisfy the Long note and provide clear title, Wells Fargo refused to do so.

On May 24, 2013, Wells Fargo tendered the complaint to First American for defense and indemnity. On June 12, 2013, First American denied the tender of defense as it had no duty under the policy to indemnify Wells Fargo for the causes of action asserted in the complaint. First American again asserted there was no continuing coverage under the policy and even if there were, the causes of action related to tortious conduct that fell outside the policy's provisions.

Wells Fargo retendered the claim on June 24, 2013, asserting First American's rejection was inappropriate. Wells Fargo contended the causes of action alleged in the complaint were covered by the policy. It asserted there was continued coverage because the Wells Fargo DOT expressly warranted it was the first lien on the property. In addition, the Hovannisians claimed Wells Fargo was liable due to the warranties in its DOT and the conveyance to them. Wells Fargo also contended that if there was any negligence, it was First American which was negligent in investigating the chain of title and First American could not rely on an exclusion to deny indemnity. Wells Fargo stated that while First American could reserve its rights should the Hovannisians prove Wells

Fargo intentionally engaged in fraud, that should not deprive Wells Fargo of its right to a defense or indemnity of the negligent misrepresentation claim.

First American denied the retender of defense on July 12, 2013. First American asserted coverage terminated because Wells Fargo sold the property without any covenants of warranties and the statement in the Wells Fargo DOT was not a warranty.

In December 2013, Wells Fargo and the Hovannisians entered into an assignment agreement by which Wells Fargo assigned and transferred to the plaintiffs "only those assignable claims and causes of action that [Wells Fargo] may now have or hereinafter acquire as against [First American] . . . based on, arising from, related to, THE POLICY, including but not limited to the failure to defend, failure to settle, and/or failure to indemnify [Wells Fargo] in the [underlying action], any actions for breach of the implied covenant of good faith and fair dealing or bad faith refusal to defend, settle and/or indemnify [Wells Fargo] against the pending action. [Wells Fargo] makes no representations or warranties, express or implied, that such claims or causes of action are meritorious or assignable. Any claims for punitive damages that [Wells Fargo] may have against [First American] based on said acts, are specifically not assigned since they are not assignable as a matter of law." In conjunction with the assignment, the Hovannisians dismissed the underlying action with prejudice.

*The Current Action*

The Hovannisians filed suit against First American in July 2014. Their claims are based solely on First American's decision to decline to defend and indemnify Wells Fargo in the underlying action. The complaint alleges two causes of action – breach of written contract and breach of the implied covenant of good faith and fair dealing (bad faith).[3]

---

[3] The complaint sought the recovery of punitive damages. In its summary judgment motion, First American sought summary adjudication of the prayer for punitive damages because punitive damages are not legally assignable, as stated in Wells Fargo's

6.

First American moved for summary judgment. First American contended the breach of contract claim was without merit because (1) Wells Fargo did not have continuing coverage after the foreclosure sale, and (2) there were no policy benefits due and owing either the Hovannisians or Wells Fargo, as the misrepresentation claims were not covered under the policy and they were based on post-policy events, namely Wells Fargo's representations during the foreclosure sale. First American asserted the bad faith claim failed because (1) there was no breach of contract, and (2) it did not act unreasonably as a matter of law under the genuine dispute doctrine.

The Hovannisians opposed the motion. They argued (1) the policy expressly provided coverage to Wells Fargo after the conveyance of title, and (2) Wells Fargo did not negate the duty to defend, as it limited its arguments to legal theories asserted in the underlying complaint and failed to show that it did not receive information that created a potential for damages being awarded for a covered risk. In addition, the Hovannisians argued that First American was not entitled to judgment on the bad faith claim as it did not establish that there was no coverage under the policy and there were triable issues of fact on whether First American engaged in a biased investigation.

The trial court issued a tentative ruling granting the motion, which it adopted as its order. The trial court agreed with First American that the breach of contract claim was without merit because the policy did not provide Wells Fargo a defense or indemnity for the claims asserted in the underlying action, therefore the bad faith claim also failed. Judgment was entered subsequently in First American's favor.

## DISCUSSION

The Hovannisians contend First American did not satisfy its burden of proving that their claims are without merit. As to the breach of contract claim, the Hovannisians

---

assignment. In granting summary judgment, the trial court granted summary adjudication on this issue. The Hovannisians do not challenge this aspect of the trial court's ruling on appeal.

7.

assert First American failed to show that (1) the policy eliminated coverage after the foreclosure sale, and (2) Wells Fargo and the Hovannisians were not entitled to policy benefits. As to the bad faith claim, they assert there are triable issues of fact regarding whether First American engaged in a biased investigation.

## I. Standard of Review

" '[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' [Citation.] 'Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action.' [Citations.] Where summary judgment has been granted, we review the trial court's ruling de novo. [Citation.] We consider all the evidence presented by the parties in connection with the motion (except that which was properly excluded) and all the uncontradicted inferences that the evidence reasonably supports. [Citation.] We affirm summary judgment where the moving party demonstrates that no triable issue of material fact exists and that it is entitled to judgment as a matter of law. [Citation.] Our review of the interpretation of an insurance contract on undisputed facts is also de novo." (*Albert v. Mid-Century Insurance Company* (2015) 236 Cal.App.4th 1281, 1289.)

## II. Title Insurance

To evaluate the order granting the summary judgment motion, we begin with a brief overview of title insurance and the rules governing the interpretation of a title insurance policy.

An insurance company's obligation to indemnify an insured depends upon the nature of the risks covered by the insurance policy. "In insurance coverage cases, 'the proper initial focus must be the language of the policy itself . . . .' " (*Golden Security Thrift & Loan Assn. v. First American Title Ins. Co.* (1997) 53 Cal.App.4th 250, 255.)

Title insurance is defined by statute as "insuring, guaranteeing or indemnifying owners of real or personal property or the holders of liens or encumbrances thereon or

others interested therein against loss or damage suffered by reason of: [¶] (a) Liens or encumbrances on, or defects in the title to said property; [¶] (b) Invalidity or unenforceability of any liens or encumbrances thereon; or [¶] (c) Incorrectness of searches relating to the title to real or personal property." (Ins. Code, §§ 104, 12340.1.)

The function of title insurance is to protect against the possibility that liens or other items not found in the title search or disclosed in the preliminary report existed. (*Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1191.) A title insurance policy "does not constitute a representation that the contingency insured against will not occur." (*Lawrence v. Chicago Title Ins. Co.* (1987) 192 Cal.App.3d 70, 74-75.) Thus, "when such contingency occurs, no action for negligence or negligent misrepresentation will lie against the insurer based upon the policy of title insurance alone. . . . '[T]he insurer does *not* represent expressly or impliedly that the title is as set forth in the policy; it merely agrees that, and the insured only expects that, the insurer will pay for any losses resulting from, or [the insurer] will cause the removal of, a cloud on the insured's title within the policy provisions.' " (*Id.* at p. 75.) " 'A title policy is *not* a summary of the public records and the insurer is *not* supplying information; to the contrary [the insurer] is giving a contract of indemnity. . . . Every insurer can and does contract to indemnify against specific risks. . . .' " (*Ibid.*)

Title insurance is fundamentally different from other types of insurance because it is not prospective in nature; it does not insure against title defects or liens that arise after the effective date and time of the policy. (*Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 322 [Title insurance does not insure against future events, but rather insures against defects in title existing at the time the policy was issued].) Moreover, title insurance does not insure against the conduct, or the alleged conduct, of the insured (*Safeco Title Ins. Co. v. Moskopoulos* (1981) 116 Cal.App.3d 658, 665-666), and does not cover "matters involving personal dealings between

individuals[.]" (*Barczewski v. Commonwealth Land Title Ins. Co.* (1989) 210 Cal.App.3d 406, 410.)

"A title insurance policy is interpreted under 'the well-established rules on interpretation of insurance agreements.' " (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1145 (*Dollinger*).) "In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of contract interpretation. [Citations.] 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation." ' " (*Ameron Intern. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1378 ) (*Ameron Intern.*).)

"An insurance policy provision is ambiguous when it is susceptible of two or more reasonable constructions. [Citation.] If ambiguity exists, however, the courts must construe the provisions in the way the insurer believed the insured understood them at the time the policy was purchased. (Civ. Code, § 1649.) In addition, if, after the court evaluates the policy's language and context, ambiguities still exist, the court must construe the ambiguous language against the insurer, who wrote the policy and is held ' "responsible" ' for the uncertainty." (*Ameron Intern., supra,* 50 Cal.4th at p. 1378.)

III. Breach of Contract

The Hovannisians contend the trial court erred in finding the breach of contract cause of action lacked merit. According to the Hovannisians, Wells Fargo's title insurance claim – which asked First American to pay off the Long note based on the Hovannisians'

10.

allegations that Wells Fargo misrepresented the priority of its lien – fell within the policy's coverage for losses or damage Wells Fargo incurred due to "[t]he priority of any lien or encumbrance over the lien of the Insured Mortgage." They contend that policy coverage continued after they received the property and even if coverage terminated at that time, the damage asserted in the underlying action, namely the failure to disclose the Long DOT prior to the property's conveyance to them, was a covered loss because it arose before Wells Fargo conveyed the property to them. Finally, they assert that even if there was no coverage for the claims asserted in the complaint in the underlying action, First American failed to satisfy its burden of showing that it did not have a duty to defend Wells Fargo.

First American asserts that the transfer of title to the Hovannisians terminated coverage under the policy. They contend there was no loss incurred during the policy period, as the underlying action was not a challenge to Wells Fargo's title during the time that Wells Fargo owned the lien because (1) no loss existed under the policy until Wells Fargo was unable to recoup its debt due to the title defect, and (2) the Hovannisians did not, and could not, sue Wells Fargo based on a direct challenge to title since they received the title without warranty. First American further contends it satisfied its burden of showing there was no duty to defend under the policy.

A. The Coverage Issues

Our resolution of the coverage issues is governed by the policy's contractual terms. As pertinent here, the policy insured Wells Fargo "against loss or damage . . . sustained or incurred by the insured by reason of: [¶] 1. Title to the estate or interest described in Schedule A being vested other than as stated therein. [¶] 2. Any defect in or lien or encumbrance on the title. [¶] 6. The priority of any lien or encumbrance over the lien of the Insured Mortgage."

The policy states that it is subject to the exclusions, exceptions, conditions, and stipulations contained in it. One of the "Conditions and Stipulations" is contained in

11.

Section 2, entitled "Continuation of Insurance," which has three subdivisions concerning the continuation of insurance after acquisition of title and after conveyance of title, and the amount of insurance after either event. Section 2(b), entitled "After Conveyance of Title[,]" provides that coverage continues "only so long as the Insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money Mortgage given by the purchaser from the Insured, or only so long as the Insured shall have liability by reason of covenants of warranty made by the Insured in any transfer or conveyance of the estate or interest. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an indebtedness secured by a purchase money Mortgage given to the Insured." Thus, the policy provided coverage to Wells Fargo as long as it "retain[ed] an estate or interest in the land," held indebtedness secured by a purchase money Mortgage given to it by a purchaser, or had "liability by reason of covenants of warranty" given in the transfer of the land.

This policy language evinces the parties' intent to limit the scope of title protection to the period running from the effective date of the policy until the insured conveys away its interest in the land unless, in the conveyance, the insured retains a mortgage secured by the land, or the insured gives warranties to the purchaser. If the insured gives a warranty to the purchaser, coverage extends to protect the insured's obligation under the warranty, but if no warranty is given, the insurance ends and any risk of loss for defective title becomes the new owner's problem. (See *Chicago Title Ins. Co. v. 100 Inv. Ltd. Partnership* (4th Cir. 2004) 355 F.3d 759, 763 (*Chicago Title*) [explaining, in interpreting identical policy language, that "[i]f a preexisting defect in title were to remain after the insured conveyed the land, the risk inherent in that defect would pass to the purchaser and the insured would no longer have risk, nor coverage."])

Here, Wells Fargo issued a mortgage secured by a deed of trust on the property after the Long DOT had already been recorded. When Wells Fargo conveyed the property to the Hovannisians in the foreclosure sale, it passed to the Hovannisians with

12.

the Long DOT attached. The Hovannisians did not give Wells Fargo a purchase money mortgage and Wells Fargo did not warrant that the property was free of liens. In fact, both the notice of trustee's sale and the trustee's deed issued to the Hovannisians expressly stated that the sale and conveyance were without express or implied warranty. At the point of conveyance to the Hovannisians, any preexisting defect in title became the Hovannisians' problem and would require them to obtain their own title insurance to protect themselves. Following the transfer, had Wells Fargo acceded to the Hovannisians' demands to correct the preexisting defect by paying off the Long DOT, it would have done more than what was promised in the trustee's deed, and incurred expenses not covered by the policy.

The Hovannisians argue the coverage limitation should not apply in this case for two reasons. First, they contend that coverage extended by virtue of the conveyance of title. In support, they point to Section 7, entitled "Determination and Extent of Liability[,]" which is contained under the "Conditions and Stipulations" and lists the limits of First American's liability. Section 7 begins with the following sentence: "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described." The sentence is followed by three subdivisions. Subdivision (a) provides that the "liability of [First American] under this policy shall not exceed the least of" (i) 125% of the amount of insurance stated in the policy, (ii) the unpaid principal indebtedness secured by the insured mortgage, or (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by the policy.[4] Subdivision (b) provides: "In the event the

---

[4] Section 7(a) provides: "The liability of the Company under this policy shall not exceed the least of: [¶] (i) One hundred twenty-five percent (125%) of the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in

13.

Insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations[**5**] or has conveyed the title, then the liability of [First American] shall continue as set forth in Section 7(a) of these Conditions and Stipulations." Subdivision (c) provides: "[First American] will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations."

The Hovannisians contend that, despite the language in Section 2(b) regarding the continuation of insurance, coverage extended under Section 7(b) because it states that First American's "liability" "shall continue as set forth in Section 7(a)" if First American "has conveyed the title." It is clear from the policy, however, that Section 2 prescribes the circumstances under which coverage under the policy will continue, while Section 7(b) sets out the limits of First American's liability should coverage continue.

---

Section 2(c) of these Conditions and Stipulations; [¶] (ii) the amount of the unpaid principal indebtedness secured by the Insured Mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon, or [¶] (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy; provided, however, that this Section 7(a)(iii) shall not apply when the defect, lien, encumbrance or other matter insured against by this policy results in a total failure of the lien of the Insured Mortgage to attach to the insured estate or interest."

**5** Section 2(a) provides: "After Acquisition of Title: The coverage of this policy shall continue in force as of Date of Policy in favor of: [¶] (i) an Insured who acquires all or any part of the estate or interest in the Land by foreclosure, trustee's sale, conveyance in lieu of foreclosure, or other legal manner which discharges the lien of the Insured Mortgage; [¶] (ii) a transferee of the estate or interest so acquired from an Insured corporation, provided the transferee is the parent or wholly-owned subsidiary of the Insured corporation, and their corporate successors by operation of law and not by purchase, subject to any rights or defenses [First American] may have against any predecessor Insureds; and (iii) any governmental agency or governmental instrumentality which acquires all or any part of the estate or interest pursuant to a contract of insurance or guaranty insuring or guaranteeing the indebtedness secured by the Insured Mortgage."

14.

Section 7(b) does not dictate the terms of when coverage continues following a conveyance of title. The two – when coverage is extended and the extent of liability – are separate things. As such, there is no conflict between the two provisions or any ambiguity in the policy language. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19 (*Waller*) ["language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract"; "[c]ourts will not strain to create an ambiguity where none exists"]; *Continental Ins. Co. v. Superior Court* (1995) 37 Cal.App.4th 69, 82 [policy provisions must be construed in relation to the entire policy "with each clause giving meaning to the other"].) Moreover, to the extent that Section 7(b) is inconsistent with Section 2(b), the specific contract terms in Section 2(b) that determine when coverage continues control over the general term of Section 7(b). (Civ. Code, § 1652 [if possible, repugnancies must be reconciled so as to give effect to the repugnant clauses]; *MacDonald & Kruse, Inc. v. San Jose Steel Co.* (1972) 29 Cal.App.3d 413, 421.)

Second, the Hovannisians contend that even if coverage terminated, Wells Fargo incurred a covered loss during the policy period, namely the failure to disclose the Long DOT or any other matters to which the DOT was subject. In support, they rely on *Chicago Title*, in which the Fourth Circuit Court of Appeals held the title insurer was required to provide a defense to its insured in a lawsuit for trespass brought by another party who claimed ownership to a tract of land the insured purportedly owned. (*Chicago Title*, *supra*, 355 F.3d at pp. 765-766.) There, the insurer argued there was no duty to defend because the trespass lawsuit was filed seven years after the title insurance terminated on the insured's conveyance of the tract. The appellate court disagreed since the alleged damage arose because of the defective title to the tract during the period before the insured conveyed the property. The court explained that "insofar as the basis of the [trespass] litigation was a dispute over title to the [parcel], while [the insured] was still the purported owner of the [parcel], the policy covers the loss or damage." (*Id.* at

15.

p. 765.)  The court further explained that the title insurance policy was not a "claims-made" policy that covered an insured only for claims asserted during the policy period, but rather covered any loss or damage during the policy period, and since the loss or damage alleged in the trespass litigation occurred during the policy period, the insurer was obligated to provide the insured a defense.  (*Id.* at pp. 765-766.)

We agree that the policy here is not a "claims-made" policy, as it provides coverage for "loss or damage . . . sustained or incurred by the Insured."  The loss or damage claimed in the underlying action, however, is not a loss or damage covered by the policy.  There is no obligation to pay benefits under a title policy unless there is a loss; a secured lender suffers an indemnifiable "loss" under a title policy only if the lender fails to recoup the debt because of an undisclosed senior lien.  (*Karl v. Commonwealth Land Title Insurance Co.* (1993) 20 Cal.App.4th 972, 978-979; see *Cale v. Transamerica Title Ins.* (1990) 225 Cal.App.3d 422, 427.)

Wells Fargo, however, never made a claim for this type of damage and the underlying action did not seek to recover such damages.  Instead, in the underlying action, the Hovannisians sought to recover for their *own* damage, namely for Wells Fargo to reimburse them for the expense of satisfying the Long note based on Wells Fargo's alleged misrepresentations.  As we have already explained, because the Hovannisians purchased the property without warranty, they received the property in whatever condition title was in at that time.  The Hovannisians could not state a claim that was adverse to Wells Fargo's title or interest because they received an unwarranted deed after a public auction.  Their only potential cause of action was for misrepresentations made during the foreclosure process.  Since the Long DOT did not pose a threat to Wells Fargo's title or interest, as it no longer had an interest in the property after the foreclosure, the Hovannisians could not state a claim for an insured title loss under the facts and circumstances they raised.

16.

B. The Duty to Defend

The Hovannisians contend that even if there was no coverage based on the allegations in the complaint in the underlying action, First American failed to meet its burden as the moving party on a summary judgment motion of showing that it did not have a duty to defend Wells Fargo in the underlying action.

"An insurer owes its insured a broad duty to defend against claims creating a *potential* for indemnity. [Citation.] The duty to defend is broader than the duty to indemnify, and may exist even if there is doubt about coverage. [Citations.] When determining whether a duty to defend exists, the court looks to all of the facts available to the insurer at the time the insured tenders its claim for a defense. [Citation.] Initially, the court compares the allegations of the complaint with the terms of the policy. [Citation.] The proper focus is on the facts alleged in the complaint, rather than the alleged theories for recovery. Nevertheless, the insured ' " 'may not speculate about unpled third party claims to manufacture coverage,' " and the insurer has no duty to defend where the potential for liability is " 'tenuous and farfetched.' " The ultimate question is whether the facts alleged "fairly apprise" the insurer that the suit is upon a covered claim.' [Citation.] Facts extrinsic to the complaint may also be examined and may either establish or preclude the duty to defend. [Citation.] Any doubt as to whether the facts give rise to a duty to defend is resolved in favor of the insured." (*Albert*, *supra*, 236 Cal.App.4th at pp. 1289-1290.)

The Hovannisians contend that in order to carry its initial burden of proof on the motion, First American was required to demonstrate, as an undisputed fact, that it did not receive any information triggering its duty to defend. They assert that instead of doing so, First American presented the "very opposite" in undisputed material fact (UMF) numbers 15 and 16, which stated, respectively: (1) "In their suit against Wells Fargo, plaintiffs alleged, *among other things*, that Wells Fargo intentionally or negligently misrepresented to plaintiffs that its deed of trust was in first position because Wells

17.

Fargo's Deed of Trust stated, "this is a First Deed of Trust which secures a note. . . .";
(2) Plaintiffs alleged two causes of action against Wells Fargo: intentional and negligent misrepresentation.**6**

To prevail on the duty to defend issue on summary judgment "the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.* Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 (*Montrose Chemical*).) Even where an insurer has moved for summary judgment, however, it is the insured's burden to prove its claim falls within the policy's coverage. (*Albert*, *supra*, 236 Cal.App.4th at p. 1290; *Roberts v. Assurance Co. of America* (2008) 163 Cal.App.4th 1398, 1407.)

Here, First American showed, based on the facts Wells Fargo and the Hovannisians presented to it both before and after the underlying action was filed, that there was no potential for coverage under the policy. The Hovannisians did not learn about the Long DOT until after they purchased the property at the foreclosure sale without warranty. Thus, as we have already explained, the only potential claim they had against Wells Fargo was for the alleged misrepresentations for which there is no liability or loss under the policy.

That First American included the words "among other things" in summarizing the allegations of the underlying complaint in UMF 15 does not indicate other facts exist that

_____

**6** Both UMFs cite the complaint and first amended complaint as evidence supporting the facts. The Hovannisians did not dispute either UMF.

18.

may give rise to a duty to defend. In its separate statement of undisputed material facts on the issue of duty to defend, First American included all of the correspondence between itself, Wells Fargo and the Hovannisians, which provided the facts upon which Wells Fargo's claim was based. In each of its responses, First American advised the Hovannisians and Wells Fargo that its denials were based on the information currently available and that if they had further information which would permit a re-evaluation of its position, they should supply it. The Hovannisians do not identify any other facts or allegations presented to First American that might give rise to a duty to defend. As such the Hovannisians failed to carry their burden to show any of their claims *may* fall within the scope of the policy. (*Montrose Chemical Corp, supra,* 6 Cal.4th at p. 300; *Albert, supra*, 236 Cal.App.4th at pp. 1292-1293.)

As there is no potential for coverage under the policy or a duty to defend, the Hovannisians' breach of contract claim is without merit.

IV. The Bad Faith Claim

A claim for breach of the implied covenant of good faith and fair dealing cannot be maintained unless benefits are due under the policy at issue. (*Waller*, *supra*, 11 Cal.4th at p. 36; see also *Dollinger*, *supra*, 199 Cal.App.4th at p. 1156.) Since we have determined as a matter of law that the policy provides no coverage for the claims asserted in the underlying action, there cannot be a bad faith claim as a matter of law. As such, we do not address First American's alternative claim that the bad faith action is barred by the genuine dispute doctrine.

## **DISPOSITION**

The judgment is affirmed.  Costs on appeal are awarded to First American.

_____
GOMES, Acting P.J.

WE CONCUR:

_____
PEÑA, J.

_____
SMITH, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAVID HOVANNISIAN, et al.,<br><br>    Plaintiffs and Appellants,<br><br>         v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | F072789<br><br>(Super. Ct. No. 14CECG02086)<br><br><br>**ORDER** |

Attorney Lisa Grant for respondent First American Title Insurance Company has requested that our opinion filed July 25, 2017 be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.

_____
                                                          Gomes, Acting P.J.

WE CONCUR:


_____
Peña, J.


_____
Smith, J.